No. 25-2048

_____

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

## LOUIS POULSEN A/S,

*Appellee-Plaintiff,*

v.

## LIGHTZEY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Judge Jorge Alonso
No. 1:24-cv-04260

_____

**BRIEF OF LAW PROFESSORS ERIC GOLDMAN AND ELIZABETH ROSENBLATT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29, and Seventh Circuit Rule 26.1, the undersigned counsel for *amici curiae* states:

1.     The full names of all *amici curiae* are: Eric Goldman and Elizabeth Rosenblatt.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) is: N/A.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* I represent are: N/A

4.     The names of all law firms whose partners or associates have appeared or are expected to appear for *amici* in this Court are: None.

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: None.

6. All information required by Federal Rules of Appellate Procedure 26.1(b) and 26.1(c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases is: None.

DATE: September 10, 2025          <u>s/ Wesley Johnson</u>

Wesley Johnson
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ......................................................... i

INTEREST OF *AMICI CURIAE* ......................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 1

ARGUMENT ......................................................................................................................... 3

    I.    Appellant Is Correct that Appellee Engaged in Abusive Litigation by
        Bringing a Defective Claim Typical of Schedule A Cases. .............................. 3

    II.   Awarding Legal Fees in This Context Would Reduce the Likelihood That
        Future Defendants Abandon Valid Defenses Due to Settlement Pressure. 9

CONCLUSION ..................................................................................................................... 14

CERTIFICATE OF SERVICE ............................................................................................. a

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS ............. b

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule
  "A"*, 51 F.4th 1365 (Fed. Cir. 2022) ......................................................... 4

*Eicher Motors Ltd. v. Partnerships & Unincorporated Associations
  Identified on Schedule "A",* No. 25-CV-02937, 2025 WL 2299593, at
  *8 (N.D. Ill. Aug. 8, 2025) ................................................................. 7-9

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994) ................................. 12

*Live Face on Web, LLC v. Cremation Society of Illinois, Inc.,* 77 F.4th
  630 (7th Cir. 2023) ........................................................................ 11-14

*LP A/S v. The Partnerships and Unincorporated Associations Identified in Schedule
  A*, 1:24-cv-04260, (N.D. Ill.) ............................................................ 2, 3

*Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 792 (7th Cir. 2014) .................. 11

*Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 203 (2016) .............................. 12

*Chen v. P'ship & Unincorporated Ass'ns Identified on Schedule A*, No. 22-cv-
  7164, 2025 WL 47972, at *1 (N.D. Ill. Jan. 8, 2025) .................................. 4-5

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................. 11

**Statutes**

Fed. R. Civ. P. 65(b)(1)(B) ................................................................. 7

**Other Authorities**

Eric Goldman, *A SAD Scheme of Abusive Intellectual Property
  Litligatio*n, 123 COLUM. L. REV. F. 183 (2023) ................................*passim*

Eric Goldman, *The SAD Scheme* 12 (June 2025), at
  https://www.ericgoldman.org/Speeches/SADSchemeJune2025.pdf ...................... 4

Nicholas Almendares, *The False Allure of Settlement Pressure,* 50 LOY.
  U. CHI. L. J. 271 (2018) ...................................................................... 11

Sarah Fackrell, *The Counterfeit Sham*, 138 HARV. L. REV. 471 (2024) ...................... 8

## INTEREST OF *AMICI CURIAE*

Statement Regarding Consent. Appellant consents; counsel for Appellee did not consent to *Amici's* motion for leave to file. Accordingly, *Amici* file a contemporaneous motion for leave under Fed. R. App. P. 29(a)(3).

*Amici curiae* are professors Eric Goldman, Santa Clara University School of Law, and Elizabeth Rosenblatt, Case Western Reserve University School of Law.[1] They are law professors who regularly write and teach about copyright, trademark, patent, and intellectual property law generally. *Amici* have also studied and written about the phenomenon of so-called "Schedule A" mass-defendant intellectual property litigation such as that pursued in this case.[2] *Amici* have no personal or financial interest in the outcome of this case. Rather, *amici* write from their broader perspectives on the abusive and legally flawed nature of Schedule A litigation.

## SUMMARY OF ARGUMENT

This case is a typical "Schedule A" case, where a plaintiff joins together a large number of usually foreign online merchants in a single infringement complaint, naming them as defendants in an attached "Schedule A" that is filed under seal (as is sometimes the entire complaint). Appellee here joined 436 defendants in one

---

[1] Rule 29(a)(4)(E) Statement: No party or party's counsel authored any part of this brief or contributed money towards its preparation or submission. No one, other than *amici* and their counsel, contributed money towards the preparation or submission of this brief.

[2] *See, e.g.*, Eric Goldman, *A SAD Scheme of Abusive Intellectual Property Litigation*, 123 COLUM. L. REV. F. 183 (2023).

complaint that consisted primarily of generic, vague, and non-particularized allegations of infringement and harm.

Like typical Schedule A plaintiffs, Appellee then sought and obtained an *ex parte* temporary restraining order ("TRO") on the basis of those flawed allegations before Appellant had notice or could contest Appellee's allegations.[3] That injunction, also under seal, resulted in the freezing of Appellant's PayPal account and a total of $185,013.44 of Appellant's funds held in it, and PayPal continued to restrain those assets even after the TRO had expired. Even though no default judgment was entered against Appellant and the case was voluntarily dismissed by Appellee after three months, the harm caused before the dismissal demonstrates the legal and procedural deficiencies in Appellee's case and in Schedule A litigation generally.

The Appellant's harms are typical for the mass-defendant Schedule A litigation model. Schedule A cases require judges to analyze extensive but vague allegations of infringement on an *ex parte* basis, supported by thousands of pages in Exhibits that the plaintiff has failed to examine closely, and to do so quickly and at scale. Appellee's generic, vague, and non-particularized allegations of infringement and harm, together with the inclusion of misleading evidence and the constant push for settlement, are common in Schedule A cases and illustrate the defects inherent in such cases. These defects are especially harmful when courts are asked to issue mass

---

[3] See Dkt. 8 (sealed TRO motion, May 23, 2024); Dkt. 14 (minute entry re TRO hearing, May 28, 2024); Dkt. 21 (minute entry re continued TRO issues, June 25, 2024), in *LP A/S v. The Partnerships…,* No. 1:24-cv-04260 (N.D. Ill.).

orders shutting down storefronts and freezing often-unrelated assets without having sufficient time and information to accurately assess the facts particular to each defendant.

Schedule A cases are rarely appealed because the model, and in particular the asset freeze, puts defendants at such an extreme disadvantage: most defendants will be forced to settle quickly, and then be voluntarily dismissed[4], or will default due to the costs or logistical difficulties of defending themselves in court—even when the claims against them are not legally or procedurally sound. Thus, this case presents a rare opportunity for this Court, in the course of evaluating the litigation and decision below, to address the abuses of the Schedule A litigation against global sellers on online platforms such as Amazon.com. When plaintiffs proceed on a threadbare or non-colorable basis for personal jurisdiction, the combination of *ex parte* TROs and platform freezes creates asymmetric settlement pressure that deters defense participation and can cause significant harm for defendants, consumers, and the online marketplaces. A fee award in such circumstances both deters overreaching filings and increases the likelihood that capable defense counsel will appear in future cases, improving the adversarial testing that district courts need at the TRO stage.

## ARGUMENT

### I. Appellant Is Correct that Appellee Engaged in Abusive Litigation by Bringing a Defective Claim Typical of Schedule A Cases.

___

[4] See, e.g., Dkts. 55 (9/2/24), 56 (9/6/24), 57 (9/13/24), 65 (9/27/24), 70 (10/7/24), 71 (10/8/24), 83 (11/1/24), 87 (4/4/25), 91 (6/3/25), 97 (7/1/25), *LP A/S v. The Partnerships and Unincorporated Associations Identified in Schedule A,* No. 1:24-cv-04260 (N.D. Ill.)

This case is one of thousands of intellectual property infringement suits over roughly the past decade brought by plaintiffs who join dozens—sometimes hundreds—of defendants, who often have no relationship with each other, in a single complaint. *See* Eric Goldman, *A SAD Scheme of Abusive Intellectual Property Litigatio*n, 123 COLUM. L. REV. F. 183, 196-198 (2023) (hereinafter Goldman, *SAD Scheme*). The numbers are staggering: estimates suggest over 4,500 Schedule A cases were filed after January 1, 2024, likely sweeping in several hundred thousand defendants.[5] Typically, the complaint lists the defendants on a separate document, commonly labeled "Schedule A," that is filed under seal. *Id.* at 184. In this case, 436 defendants were joined and listed on Schedule A, which was filed under seal.

Schedule A cases follow a predictable pattern. First, Schedule A plaintiffs typically request an *ex parte* TRO, also under seal, on the basis of their generic (and often cookie-cutter) complaint and declarations. *See* Goldman, *SAD Scheme* at 197-98. District courts routinely grant the *ex parte* TRO requests, as the request in this case was, with little or no examination of the sufficiency of the allegations, the merits of the infringement claims, or the nexus between any individual defendant's conduct and the alleged harm. Before any defendant has had a chance to explain their practices to the court,[6] the TROs change the status quo and disadvantage the

---

[5] See Eric Goldman, *The SAD Scheme* 12 (June 2025), at https://www.ericgoldman.org/Speeches/SADSchemeJune2025.pdf

[6] Notice is essential. *See ABC Corp. I*, 51 F.4th at 1375-76. But just as in this case, Schedule A defendants almost never get notice before a TRO, and often get actual notice only shortly before a preliminary injunction is entered. *See* Appx 597-98; *see also, Chen v. P'ship &*

defendants in material ways. The TROs routinely result in a freeze of the allegedly infringing merchants' accounts and assets on online marketplaces and other vendors (such as, in this case, PayPal). *See id*. at 197. Because the freeze negatively impacts their businesses, many defendants then rapidly settle in order to have their accounts unfrozen—whatever the legal merits of the claims—because it is "cheaper, quicker, or more predictable compared to fighting back." *Id*. at 192.

The second step followed in typical Schedule A cases is a rapid preliminary injunction based on, by reference, nothing more than the same evidence presented in support of the TRO. Defendants usually hear about the upcoming motion for preliminary injunction shortly after being served with summons, by email[7], for the first time. Often, as in this case, Defendants have no more than a week to retain counsel and prepare for the preliminary injunction hearing. In this case, summons were issued on June 17, 2024. The motion for preliminary injunction was filed on June 18, 2024 (DKT#19), and noticed for presentment one week later, on June 25, 2024. On that date, the preliminary injunction was order was entered. None of the 436 defendants appeared[8].

The next step is the initial wave of freeze-induced settlements. Defendants,

---

*Unincorporated Ass'ns Identified on Schedule A*, No. 22-cv-7164, 2025 WL 47972, at *1 (N.D. Ill. Jan. 8, 2025).

[7] Service of process by email is itself highly problematic, but is not considered in this brief, as service of process has not been contested.

[8] According to the returns of service filed by Plaintiff, Dkt##23-28, service on defendants actually occurred on June 24, 2024, which would have given defendants, at most, one day to respond to the motion for preliminary injunction.

having had their assets frozen, and often prevented from conducting any business at all, have little choice but to seek settlement, even where, as here, there is a legitimate defense.

Those who do not initially settle are subject to the fourth step: the plaintiff, typically, seeks default judgments against defendants who have not appeared in the case, typically relying on the same or similar generic assertions as the TRO requests, which courts also tend routinely to grant. *See* Goldman, *SAD Scheme,* at 192.

Schedule A litigation abuses harm parties beyond those directly involved. For example, they harm consumers by restraining legitimate competition in online marketplaces, which usually freeze both allegedly infringing *and* unchallenged non-infringing items upon receipt of the TRO. Goldman, *SAD Scheme* at 191. In other words, by restraining the defendant's online account, the plaintiff improperly prevents the commercial availability of every *non-infringing* item being sold by the defendant at that account. Furthermore, improper mass-joinder has deprived the federal government of hundreds of millions of dollars in court filing fees for suits that, under the Rules of Civil Procedure, should have been brought separately. *Id.* at 185.

Appellee's lawsuit presents many of the procedural abuses found in the typical Schedule A cases. First, Appellee filed the case seeking an asset freeze disproportionate to any plausible damages at the outset. As Judge John F. Kness of the Northern District of Illinois has observed, an asset freeze "appears to be a coercive goal in and of itself because, if obtained, the freeze immediately locks down defendants' assets, which combined with the *ex parte* TRO, causes 'severe or fatal

cash-flow problems for the defendant, which may not be able to pay its vendors, employees, or lawyers.'" *Eicher Motors Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 25-CV-02937, 2025 WL 2299593, at *8 (N.D. Ill. Aug. 8, 2025) (citing Goldman, *SAD Scheme* at 191). Appellee was then granted an *ex parte* TRO that resulted in the freezing of $185,013.44 in Appellant's PayPal account, all while the case was still under seal and before any notice or chance for Appellant to contest Appellee's allegations.[9] That TRO was incompatible with Rule 65(b)(1)(B), which permits a TRO without notice only if "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."[10] *See Eicher* at *16.

Second, in this case, after receiving Appellant's opposition, Appellee relied on "an irrelevant screenshot" that provided the sole basis for personal jurisdiction.[11] Instead of dismissing the case immediately after recognizing the mistake, Appellee asked for informal discovery about Appellant's sales and provided what it likely considered a low-ball settlement demand to Appellant in the hopes that it would resolve the dispute. Given Appellant's evidence of no U.S. sales, the negotiation appears aimed at pressuring Appellant to settle because Appellant would face operational difficulties in addition to legal fees as a result of the Appellee's requested discovery and prolonged restriction on assets. As Judge Kness noted in a question

---

[9] See Dkt. 68, *2, No. 1:24-cv-04260 (N.D. Ill.).

[10] Fed. R. Civ. P. 65(b)(1)(B)

[11] See Dkt. 68 *5, No. 1:24-cv-04260 (N.D. Ill.).

that seemingly applies to the Appellee's settlement demands, "the approach of Schedule A plaintiffs also raises questions about whether their primary aim is to stop infringement." *Eicher* at *15. If Appellee's goal in procuring the TROs was to ask for emergency relief to stop infringement, Appellee's settlement communications indicate that it was more interested in ransoming Appellant's assets for a payout than in actually stopping any alleged infringement.

Third, the complaint asserted that the foreign defendants were "counterfeiting." The term "counterfeit" appears approximately 60 times to imply criminality and to seek extraordinary remedies. However, trademark infringement is not the same thing as "counterfeiting," and many of Plaintiff's allegations barely assert trademark infringement, much less counterfeiting. Plaintiffs often improperly conflate infringement claims with the much more serious offense of counterfeiting. *See* Sarah Fackrell, *The Counterfeit Sham*, 138 HARV. L. REV. 471, 495-500 (2024).

Schedule A schemes leverage strict-liability IP claims, prosecute *ex parte* with boilerplate mass-joinder pleadings, and secure far-reaching asset bans that typically far exceed amounts from alleged infringement and cripple legitimate commerce. More importantly, defendants – typically small foreign companies – are left with no ability to tap funds to pay suppliers, employees, or counsel. See Goldman*, SAD Scheme* at 197-202. This is a form of systemic abuse that deploys federal court litigation as a weapon to force payments from sellers, sometimes even when the claims against them are unfounded. This appeal gives the Court a rare opportunity to articulate guardrails for *ex parte* relief and asset freezes in mass-defendant IP cases, ensuring

that such extraordinary measures rest on particularized showings as to each defendant.

## II. Awarding Legal Fees in This Context Would Reduce the Likelihood That Future Defendants Abandon Valid Defenses Due to Settlement Pressure

This Court has long recognized that intellectual property cases can be burdensome and lead to abuses, and that defendants should not be unduly burdened by litigation costs, thereby encouraging the vigorous defense of rights and the proper functioning of the legal system.[12]

Defendants' rights in Schedule A cases have been eroded significantly. Judge Kness warned that Schedule A cases are harming public interest as "Defendants in Schedule A cases therefore tend to "settle involuntarily…[p]rompting unwarranted settlements is a 'systemic process failure, not the prosocial outcomes normally associated with settlements….'". See *Eicher* at \*22. Appellant endured a three-month period in this case after it engaged counsel while Appellee continued to insist on a settlement before dismissing the case. Appellant's legal fees amounted to $60,000,[13] despite the absence of a merits adjudication—precisely the kind of unwarranted cost and coercive pressure that Schedule A procedures encourage.

---

[12] *See e.g., Live Face on Web, LLC v. Cremation Society of Illinois, Inc.*, Case No. 22-1641 (7th Cir. Aug. 11, 2023) (Because of "copyright law's asymmetric recoveries . . . , without an award of attorney's fees, a defendant faces pressure to abandon his meritorious defenses and throw in the towel because the cost of vindicating his rights (his attorney's fees) will exceed the private benefit he receives from succeeding (a nonexcludable right to continue doing what he was already doing)").

[13] See Dkt. 68, \*2, No. 1:24-cv-04260 (N.D. Ill.).

Appellant is one of the few Schedule A defendants that was able to continue sales through its own website. For the vast majority of the defendants in Schedule A cases selling through online marketplace, the burden of legal fees is an additional cost on top of (1) the cash flow problems caused by the TRO, and (2) the risk of delisting and decrease in ranking (most marketplaces take down listings and freeze all accounts immediately before the sellers receive any notice).

As a result of this disproportionate settlement pressure, in this Case, 122 defendants were voluntarily dismissed by the plaintiff, likely through settlement arrangements[14], presumably at a price no less than $2000 per store based on Appellee's "low-ball offer."[15] Many of those dismissals likely reflect settlements compelled by asset freezes and marketplace restraints rather than adjudications on the merits. Only two sellers appeared through U.S. attorneys, including Appellant.[16]

Those settlements were wrong for a number of reasons. First, they were obtained under the coercive shadow of *ex parte* TROs and asset freezes, which lock down defendants' assets at the start of litigation and give defendants little reasonable alternative but to settle for release. The settlements are also largely devoid of legitimate service of process or notice, leaving many defendants without an opportunity to challenge liability.

---

[14] See Dkts. 29, 30, 36, 42, 43, 44, 47, 48, 49, 51, 52, 53, 56, 57, 65, 70, 71, 83, 87, 91, 97, No. 1:24-cv-04260 (N.D. Ill.).

[15] See Dkt. 68 *6, No. 1:24-cv-04260 (N.D. Ill.).

[16] See Dkts. 61, 64, No. 1:24-cv-04260 (N.D. Ill.).,

Courts have used the specter of "blackmail" or "in terrorem" settlements to justify a more searching scrutiny of aggregated litigation.[17] Similarly, the Supreme Court injected merits issues into the class certification analysis in part because of concerns about settlement pressure. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). These doctrines rely on the belief that defendants will "overpay" settlements in order to hedge against the risk of catastrophic liability. See Nicholas Almendares, *The False Allure of Settlement Pressure,* 50 LOY. U. CHI. L. J. 271 (2018).

The Seventh Circuit noted in *Live Face on Web, LLC v. Cremation Society of Illinois, Inc.,* 77 F.4th 630 (7th Cir. 2023), that fee shifting determination should also consider public policy and there is "very strong presumption in favor of awarding a prevailing copyright defendant his fees and costs" because the defendant's attorney acts as "a private attorney general, combating a disreputable business practice—a form of extortion." *Id.* at 632, 634, *citing Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 792 (7th Cir. 2014).

In *Live Face*, the Seventh Circuit also noted that a court should consider the effects of *not* awarding fees in addition to the deterrent effects of awarding fees. Not awarding fees would have the effect of "discouraging defendants from abandoning meritorious defenses", and discouraging defendants "from persisting in defenses that might one day persuade the Court and thus bring clarity to future litigants", which is "the point of the Copyright Act's fee structure: to promote meritorious

---

[17] *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1298–99 (7th Cir. 1995).

claims and defenses." *Id.* at 635.

That reasoning applies with even greater force to abusive "Schedule A" cases like this Case. Among the thousands of such cases filed, involving hundreds of thousands of small-business and individual defendants, only a handful ever reach merits litigation. This is not because the claims are universally strong, but because plaintiffs' use of *ex parte* TROs and sweeping asset freezes exerts overwhelming coercive pressure on defendants to settle regardless of the merits. The *Live Face* court warned against precisely this form of extortionate leverage. Other courts have similarly recognized that without the possibility of recovering fees, defendants rationally abandon valid defenses rather than risk financial ruin. *See*, *e.g.*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994) (emphasizing the need for fee-shifting to ensure defendants are not "unduly discouraged from litigating meritorious defenses"); *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 203 (2016) (noting that fee awards are a critical safeguard to encourage defendants to resist overreaching claims).

This Case stands out as an even more egregious example of the abuses endemic to Schedule A litigation due to the inclusion of false or misleading evidence that was central to Appellee's claims. More than many typical Schedule A cases, where the evidence may be incomplete or generic, here Appellee presented a screenshot that was not only irrelevant but demonstrably inaccurate as the primary basis for personal jurisdiction and claims of infringement.

Appellee's reliance on this evidence to support its legal actions is a stark example of how abusive litigation practices in Schedule A cases can be manipulated

to apply undue pressure on defendants. The inclusion of such misleading evidence—especially when it was later recognized as irrelevant—makes this case even more troubling. It is precisely the kind of conduct that the legal system seeks to deter through fee-shifting. By advancing these false claims, Appellee sought to leverage procedural mechanisms (such as the *ex parte* TRO) to impose harm on the defendant before the accuracy of its evidence could even be challenged.

This Court should recognize the risk and the consequence of *not* awarding legal fees by district courts. The denial of fee shifting in this Case will allow continued unfair settlement pressure and further discourage the very few U.S. attorneys advocating for defendants' rights in Schedule A cases. More importantly, applying the *Live Face* standard allowing fee shifting in this particular Case discourages future plaintiffs who might consider using similar deceptive practices, and helps ensure that courts remain vigilant in preventing the exploitation of procedural mechanisms for improper purposes.

This Court should recognize that denying fee-shifting in this context would exacerbate the very harms Congress and the Supreme Court have sought to prevent: it would embolden plaintiffs to continue exploiting procedural mechanisms to extract settlements unrelated to the merits, while dissuading defendants from asserting legitimate defenses. The consequences are not limited to the parties before the Court, but ripple outward—encouraging the filing of ever more abusive cases, corroding confidence in the fairness of the judicial process, and depriving the public of precedent that clarifies the limits of intellectual property rights.

Moreover, there is a relative dearth of Schedule A case law in the Seventh Circuit despite the thousands of Schedule A cases that have been filed in the Northern District of Illinois. Denying fees in this case would discourage defendants from "persisting in defenses that might one day persuade the Court and thus bring clarity to future litigants". *See Live Face* at 635.

Accordingly, an award of attorneys' fees consistent with *Live Face* ruling here is necessary not only to make this prevailing defendant whole, but also to deter abusive litigation strategies, safeguard the integrity of the courts, further the evolution of the Copyright law, and ensure that future defendants are not coerced into abandoning valid defenses.

## CONCLUSION

This case is a typical example of the Schedule A model. A single complaint was brought against numerous defendants whose identities were kept under seal; an *ex parte* and sealed TRO was sought and granted with no careful examination of the sufficiency of the generic and non-specific factual allegations and nexus between the alleged infringement and alleged harm; and Appellee engaged in extensive settlement negotiation with the goal of inflating litigation costs and adding cash flow pressure even after it had concluded that its claims were based on a mistaken and irrelevant screenshot.

For the reasons set forth above, *amici* respectfully support reversal and urge this Court to provide guidance to district courts on the abuses prevalent in Schedule

A litigation. They believe it is important for this Court to consider the broader context of the many procedural and legal deficiencies in how this case, like most other Schedule A cases, was litigated and how those litigation abuses can harm litigants, competition, and consumers.

To *amici*'s knowledge, Schedule A appeals are rare in this Court, even though thousands of Schedule A cases have been filed in the Northern District of Illinois. This is because the model puts defendants at such an extreme disadvantage: most defendants will be forced to settle quickly, be voluntarily dismissed, or will default— irrespective of whether the claims against them are meritorious. *See* Goldman*, SAD Scheme* at 201. Thus, this case presents a rare opportunity for this Court, in the course of evaluating the litigation and decision below, to address the abuses of the Schedule A litigation model and to provide guidance to district courts handling such cases.

DATE                                         Respectfully submitted,

                                             By: /s/ Wesley Johnson

                                             WESLEY JOHNSON

                                             *Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2025, I caused the foregoing BRIEF OF LAW PROFESSORS ERIC GOLDMAN AND ELIZABETH ROSENBLATT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

DATE September 10, 2025        <u>/s/ Wesley Johnson</u>

WESLEY JOHNSON

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify as follows:

1.      The foregoing BRIEF OF LAW PROFESSORS ERIC GOLDMAN AND ELIZABETH ROSENBLATT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL complies with the type-volume limitation of Fed. R. App. P. 29(a)(5).

2. This brief complies with the typeface and type-style requirements of Seventh Circuit Rule 32. It has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12 point font, with footnotes in 11 points.

DATE September 10, 2025                    /s/ Wesley Johnson

                                          WESLEY JOHNSON

                                          *Counsel for Amici Curiae*