No. 25-2048

--------------------------------

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

--------------------------------

Louis Poulson A/S,

       Plaintiff -- Appellee,

v.

Lightzey,

       Defendant – Appellant.

--------------------------------

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 1:24-cv-04260
The Honorable Judge Jorge Alonso

--------------------------------

BRIEF OF THE
DEFENDANT-APPELLEE, LOUIS POULSON, A/S

--------------------------------

Joseph E. Tighe
Reyes Kurson, Ltd
216 South Jefferson Street
Chicago IL 60661

Zareefa B. Flener
James E. Judge
Ying Chen
Flener IP Law, LLC
77 West Washington Street
Chicago, IL 60602

*Counsel for Appellee*

ORAL ARGUMENT REQUESTED

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2048

Short Caption: Louis Poulsen A/S v. Lightzey

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Louis Poulsen A/S

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Flener IP Law, LLC

Reyes Kurson, Ltd.

(3)      If the party, amicus or intervenor is a corporation:

   i)          Identify all its parent corporations, if any; and

   FLOS B & B Italia Group

   ii)          list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Joseph E. Tighe          Date: October 14, 2025

Attorney's Printed Name: Joseph E. Tighe

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✓    **No** ☐

Address: Reyes Kurson, Ltd., 216 South Jefferson Street, Suite 602, Chicago, IL 60661

Phone Number: (312) 332-0055          Fax Number: (312) 332-0419

E-Mail Address: jtighe@rkchicago.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES     ii

Jurisdictional Statement     1

Statement of the Issues     1

Statement of the Case     1

Summary of the Argument     3

Argument     7

    I. The District Court's Order Denying Defendant's     7
    Petition for Attorneys' Fees Was a Proper Exercise
    of its Discretion

      A. Standard of Review     7

      B. The District Court Did Not Abuse its     8
      Discretion

        1. The Defendant Does Not Challenge the District     9
        Court's Finding that its Fee Petition was
        Unreasonable

        2. Defendant Provided Plaintiff a Date by Which to     11
        Act, and Plaintiff Acted Within the Time Demanded

        3. Plaintiff Filed and Prosecuted a Typical, not     14
        Exceptional, Case in an Appropriate and
        Professional Manner

    II. "Schedule A" Cases Are Appropriate Vehicles for Judicial     22
    Relief Providing Sufficient Procedural Safeguards

      A. Standard of Review     22

      B. Criticisms of "Schedule A" Cases are Misplaced     23

        1. Overview of "Schedule A" Litigation     24

        2. Criticism of a Plaintiff's Complaint and Joinder     30
        Decision in a Typical "Schedule A" Case is
        Misplaced

## Jurisdictional Statement

Plaintiff accepts defendant's Jurisdictional Statement as correct.

## Statement of the Issues

The only justiciable issue is whether, under *Octane Fitness*, the district court committed reversible error when it denied a post-dismissal petition for attorneys' fees in this Lanham Act case.

## Statement of the Case

Plaintiff's suit against defendant was resolved without trial, answer, or challenge. After dismissal, defendant presented a request for fees, decided without evidentiary hearing.

In its fee request, defendant presented the parties' informal communications, and its presentation of the case on Brief relies upon those communications. While the quotations are accurate, defendant's presentation attributes subjective intent behind plaintiff's communications and actions, and those are arguments, not facts, which plaintiff does not accept. Given the nature of the appeal, however, it is not necessary to restate the procedural history of the case.

The district court found defendant's fee petition to be unreasonable. [Dkt. # 89] Defendant's presentation of the case omits discussion of the substance of its petition for fees. [Dkt. # 68]

Defendant became aware of plaintiff's suit on July 15, 2024. [Dkt. # 68-1, p. 2; also set forth in Deft. Separate Appendix ("Sep.App.") A-110] On July 22, 2024, defendant contacted plaintiff's counsel requesting evidence supporting

the claim against it, and, on July 24, 2024, it received a copy of the complaint and temporary restraining order. [Dkt. # 68-1, p. 3; Sep.App. A-111]

In connection with defendant's initial request for information and response, plaintiff requested defendant on August 4, 2024 to provide substantiation for its assertion that it had not made sales of infringing products in the United States. [Dkt. # 68-5, p. 17; Sep.App. A-152] Defendant responded the following day [Dkt. # 68-5, pp. 15-16; Sep.App. A-150-51], presenting its contention (without offering supporting evidence) that it did not sell infringing products in the United States.

Thereafter, the parties did not interact with one another until August 27, 2024, when defendant renewed its assertion that there had been no sales in the United States. [Dkt. # 68-5, pp. 15; Sep.App. A-150] On August 27, twice on August 29, and a fourth time on September 1, 2024, defendant advised that, if plaintiff had not withdrawn from suit by September 3, 2024, defendant would seek relief. [Dkt. # 68-5, p. 15; Sep.App. A- 150 (August 27); Dkt. # 68-5, pp. 13-14; Sep.App. A- 148-49 (August 29); Dkt. # 68-5, p. 12; Sep.App. A- 147 (August 29); Dkt. # 68-5, p. 10; Sep.App. A-145 (September 1)]

The September 1, 2024, demand that plaintiff dissolve the interlocutory order by September 3, 2024, also enclosed proof substantiating defendant's assertion that there had not been any domestic sales. [Dkt. # 68-5, p. 10; Sep.App. A- 145] On September 2, 2024, plaintiff filed its notice of voluntary dismissal with prejudice. [Dkt. # 55]

The docket entry immediately preceding plaintiff's voluntary dismissal is defendant's notice that it would be seeking leave of court to appear. [Dkt. #54] Defendant had taken no other actions in the case.

Defendant requested more than $140,000 for the work of two firms. One firm claimed fees of $101,525.00, [Dkt. #84-3, p. 2] and the second firm claimed fees of $41,300.00. [Dkt. 84-1, p. 4]

Defendant identified time charges preceding and following dismissal of plaintiff's complaint. Preceding dismissal, defendant claimed to have spent 47 hours and, afterwards, another 78.8 hours. [Dkt. # 81, pp. 20-21, 24]

The professional time for which defendant sought compensation was concentrated on two timekeepers, who collectively represented 115.6 of the 131.5 hours charged by all timekeepers. [Dkt. # 81, p. 20] One professional charged $1,100 per hour, and the other charged $1,200 per hour. [*Id.*]

Plaintiff objected to the petition on multiple grounds. [Dkt. # 81] Defendant replied in support of its petition [Dkt. # 84]

In its order denying defendant's fee petition, the court determined that defendant's fee petition had been unreasonable. [Dkt. # 89, p. 4; a copy of the Order is also submitted as part of the Appendix included in defendant's Brief ("Deft.App.") at Deft.App. A-4]

## Summary of the Argument

Defendant seeks this Court's assessment and guidance concerning a class of cases that plaintiffs bring predominantly in the Northern District of Illinois in efforts to combat what they see as internet counterfeiting. Those cases are

referred to generally as "Schedule A" cases due to the nature of the initial papers filed in them.

This Court does not issue advisory opinions, however, and it is not the appropriate forum to address generalized criticisms, hypothesized scenarios, or fears about "Schedule A" cases. This case arises from a district court's denial of a fee petition.

Defendant, plaintiff, and the district court all acknowledged that defendant's fee petition called for analysis under the *Octane Fitness*[1] standards that this Court recognized in the *LHO* cases[2] to be applicable in Lanham Act cases. Defendant's argument that this constituted an "exceptional case" boiled down to an issue of fact known only by defendant at the time plaintiff sued and an argument that, because the case lacked merit, it constituted an "exceptional" case, improperly pursued.

The district court disagreed, but its decision need not be reviewed because the record presents independent grounds for affirmance. Defendant raises no issue with the district court's characterization of its fee petition as unreasonable and wildly excessive.

Even if defendant could overcome that fatal defect in this appeal, the record establishes a second independent reason for affirmance. On four occasions, defendant provided the date on which it intended to take action if plaintiff did

---

[1] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545 (2014)
[2] [2] *LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384 (7th Cir. 2019) (("*LHO I*"); *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 965 (7th Cir. 2021) ("*LHO II*")

not dismiss its case, and the record establishes that plaintiff dismissed the case prior to defendant's date.

The district court's expressed reasons were sound and supported by the record. As the defendant and the *amici* argue, this was a typical "Schedule A" case. It was filed and prosecuted in good faith.

Despite having the opportunity to do so, defendant never challenged any aspect of the case while it was pending. Defendant made no effort in the district court to distinguish this case from any other, and it brought no issues to the district court relating to its *ex parte* orders. Plaintiff voluntarily dismissed the case the day after it received the information it needed to assess defendant's informally communicated assertions.

The true focus and thrust of the Briefs presented by defendant and the *amici* is the non-justiciable criticism of "Schedule A" litigation, generally. Conceding that this is a typical "Schedule A" case, they suggest that there is something unfair or dangerous about the use of traditional procedural law when plaintiffs combat internet counterfeiting, and they identify aspects of what they see as the "steps" in "Schedule A" litigation that present concern to them.

Plaintiff and its counsel agree with two aspects of the presentations offered by defendant and the *amici*. First, the current predominance of "Schedule A" litigation in the Northern District of Illinois, coupled with the burgeoning number of "Schedule A" cases, imposes an administrative burden on the members of the District Court that is not borne in other Districts. Second, the

inherent nature of a typical "Schedule A" case imposes a significant administrative burden on the judge because the case begins with emergency motions disrupting the calendar, and those motions require the judge to review hundreds of claimed infringements without the benefit of vigorous advocacy opposing a plaintiff's request.

Plaintiff does not agree that the problems summarized in the preceding paragraph result from flaws in the structure of the law or errors in the application of law to the facts of the cases considered. Plaintiff does not agree that the predominance of "Schedule A" cases in the District or the burdens inherent in a typical "Schedule A" case leads to improper or unfair results.

There is no reason to change the law or impose arbitrary limits within "Schedule A" cases. Defendant and the *amici* overstate the risks that they attribute to the worries that they express about procedural elements applicable in a typical "Schedule A" case. The alternatives they propose would create additional administrative burden on the court, without any corresponding benefit to anyone.

As a last resort, defendant and the *amici* urge this Court, essentially, to make an example out of plaintiff by awarding fees in a typical "Schedule A" case to deter potential plaintiffs from suing and to encourage more defendants to enter the fray in "Schedule A" cases. Although they profess to acknowledge and seek application of *Octane Fitness* and the *LHO* cases, defendant and the *amici* seek the opposite. They ask this Court, in essence, to turn what they agree is "typical" into what Congress calls "exceptional" and, in the process,

mandate the award of fees in any typical "Schedule A" case that happens to present a good-faith but insufficient claim.

Defendant and the *amici* rest their presentations on distrust of the plaintiffs' bar and a lack of confidence in the judiciary. Everything boils down to fears that plaintiffs seek to overstate their claims and that judges do not adequately conduct an independent review of requests for *ex parte* relief in a typical "Schedule A" case.

<u>Argument</u>

I.
The District Court's Order Denying Defendant's Petition for <u>Attorneys' Fees Was a Proper Exercise of its Discretion</u>

A.  *<u>Standard of Review</u>*

Defendant has appealed one order [Dkt. # 89], and the standard of decision applicable to that order was the issuing court's discretion. This Court reviews appeals from discretionary orders under an "abuse of discretion" standard. *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 965 (7th Cir. 2021) ("*LHO II*") (*citing, LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384 (7th Cir. 2019) (("*LHO I*")) and *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994)

Defendant devotes a substantial portion of its Brief (pages 11 through 21) to what it tries to elevate to an independent issue entitled to "*de novo*" review. That argument relates to the District Court's exercise of personal jurisdiction

when it entered its interlocutory orders in the case below.[3] Defendant did not challenge or seek relief from the District Court's interlocutory orders or move to dismiss plaintiff's complaint, however, and its notice of appeal only brings the order denying the fee petition [Dkt. # 89] before this Court. (*See, Heraeus Kulzer, GMBH v. Biomet, Inc.*, 881 F.3d 550, 563 (7th Cir. 2018), *citing, Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012)) There are no issues on this appeal that call for "*de novo*" review.

B.    *The District Court Did Not Abuse its Discretion*

This Court should affirm:

- First, defendant's fee petition was unquestionably unreasonable;

- Second, defendant repeatedly provided plaintiff a date by which to dismiss the case and cannot thereafter complain that plaintiff did so; and

- Third, this was a typical, not an exceptional, "Schedule A" case pursued in good faith and prosecuted properly.

Plaintiff will address each point separately. Recognizing that defendant and the *amici* seek review of what defendant characterizes as a "cottage industry" (Deft. Brief, p. 7), plaintiff will address the "industry"-wide criticisms of "Schedule A" litigation in its second argument.

---

[3] The District Court entered a Temporary Restraining Order May 28, 2024 [Dkt. # 14], extended that Order June 4, 2024 [Dkt. # 18], and entered a preliminary injunction June 25, 2024 [Dkt. # 22].

1. The Defendant Does Not Challenge the District Court's Finding that its Fee Petition was Unreasonable

The district court found that defendant's fee petition was unreasonable. [Dkt. # 89, page 4; Deft. App. A-4] It identified some of the reasons for that finding, as well:

> *If the case was costly to Lightzey, this appears to be primarily because its counsel billed for more work than was necessary and appropriate under the circumstances; indeed, the fees Lightzey claims to have incurred defending this suit are wildly excessive. The Court need not go through all the reasons why Lightzey's fee petition is unreasonable,* but it would be remiss if it did not point out that, apparently, Lightzey could have nipped this matter in the bud by promptly providing the sales data Plaintiff first requested on August 4, 2024, which Lightzey did not provide for several more weeks. Instead, Lightzey spent almost 50 hours working on this case until it was ultimately resolved by way of a brief email exchange about a relatively simple issue of personal jurisdiction. Then, Lightzey's counsel spent nearly 80 hours working on the present motion for attorney fees. The Seventh Circuit has explained that "the hours claimed to have been expended on the fee request [should] bear a rational relation to the number of hours spent litigating the merits of the case," and it is "patently unreasonable . . . to expend the same number of hours, or almost as many on . . . a fee petition as . . . on the merits." (*Spegon v. Cath. Bishop of Chicago*, 175 F.3d 544, 554 (7th Cir. 1999)). Lightzey spent approximately thirty more hours on the fee motion than on the merits, which is patently unreasonable.

(Emphasis and initial bracket added; second bracket within quotation from *Spegon* supplied by district court)

The Record supports the district court's characterization. Defendants claimed a total of 131.5 hours, provided by five timekeepers. Two timekeepers charged 115.6 hours between them, one at a $1,200 hourly rate and the other at $1,100. [Dkt. # 81, p. 20] Plaintiff objected to the reasonableness of

defendant's request on multiple grounds [Dkt. # 81], and defendant had the opportunity to reply. [Dkt. # 84]

In *Spegon*, plaintiff had a straightforward claim that could have been resolved by reviewing and performing calculations on time records submitted by plaintiff to his employer. The district court found that plaintiff's counsel failed to exercise billing judgment by, essentially, rushing to litigation when a lawyer of reasonable experience and judgment would have first contacted the potential defendant, explained the issue, and resolved the matter. (175 F.3d at 551-52)

Here, defendant informally asserted a fact pertinent both to the merits and to personal jurisdiction and, in response, received a request for documentation that defendant resolved with an email. Defendant compounded its original abandonment of billing judgment with a grossly excessive charge for post-dismissal work, despite *Spegon's* holding that seeking compensation at a rate of 15 minutes for post-dismissal work for every hour of pre-dismissal prevailing party work would be excessive. (*Id.*, at 554, *relying on, Ustrak v. Fairman*, 851 F.2d 983, 987-88 (7th Cir. 1988))[4]

Unlike in *Spegon*, fees here were discretionary. It was defendant's burden to present a reasonable petition for fees. Defendant failed to do so and makes no attempt on appeal to claim otherwise. Since this Court may affirm a final order on any grounds appearing in the record, (*O'Brien v. Caterpillar, Inc.*, 930 F.3d

---

[4] 78.8 hours of post-dismissal work, divided by 47 hours of pre-dismissal work, translates to a little more than one hour and 40 minutes of time spent after dismissal for every hour of time spent while the case was active.

923, 928 (7th Cir. 2018)) the defendant's failure to challenge the district court's finding is fatal to this appeal.

   2. Defendant Provided Plaintiff a Date by Which to Act, and Plaintiff Acted Within the Time Demanded

Although the *amici* portray this case as a three-month ordeal imposed on defendant, the defendant itself acknowledges otherwise. According to defendant, it became aware of this case July 15, 2024 [Deft. Brief, pp. 4-5], it reviewed plaintiff's complaint July 24, 2024 [Dkt. # 68-1, p. 3; Sep.App. A-111], and it advised plaintiff on July 25, 2024, that it had not made sales in the United States. [Deft. Brief, p. 7]

Defendant's representation was made in an email in which defendant accepted service "as a goodwill gesture" without conceding that jurisdiction was appropriate, an act offered "so that we can have a discussion to resolve this case amicably." [Sep.App. A-155] After an exchange regarding a separate product, defendant wrote on August 2, 2024, advising that defendant targets the UK market and does not sell infringing products in the United States.

After expressing its view of jurisdiction, defendant stated, "We appreciate your willingness to settle, and my client also expressed such a willingness. The client has assured me that [it] will not sell to the U.S. To that end, we are willing to sign an undertaking. After that, unfreezing our client's PayPal account will be in order. Does that sound acceptable to you and your client?" [*Id.*, A-154]

On August 4, 2024, plaintiff requested that defendant provide the evidence supporting the absence of sales. [*Id.*, A-152] Defendant responded the following

day with counsel's representation but not with evidence [*id.*, A-150-51], and defendant did not communicate again with plaintiff until August 27, 2024. [*Id.*, A-150]

In the August 27, 2024, email, defendant changed its tone. Relying on past representations that counsel characterized as "evidence," counsel asserted that the case lacked merit, the Temporary Restraining Order should not have been entered, and plaintiff should take prompt action to correct its mistakes: "If you fail to do so before **September 3, 2024**, we will have no choice but to move to lift your TRO and ask the court to award attorney fees in connection with our efforts to correct your mistakes." [*Id.*; bold-face and underline in original]

Plaintiff's responding request for screenshots of sales information led to an August 29, 2024 email from defendant. Defendant again asserted the lack of United States sales, but it offered to provide the evidence that plaintiff had requested if the plaintiff would acknowledge the application and protection of Rule 408 of the Federal Rules of Evidence. [*Id.*, A-148-49]

In that email, defendant renewed its demand that plaintiff take "corrective action. If you fail to do so, we will after September 3, 2024." [*Id.*, A-149] Plaintiff's response expressed plaintiff's willingness to receive sales evidence under the protection of Rule 408. In the absence of evidence relating to sales, plaintiff offered a settlement amount, clearly implying its openness to a lower amount if sales information warranted it. [*Id.*, A-147]

That same day, defendant sent a further email to make clear that, from defendant's perspective, the removal of the pending Temporary Restraining

Order was a separate matter from settlement and required immediate action: "If you fail to do it, we will file a motion to dissolve the TRO after September 3, 2024. And we will seek attorney fees." [*Id.*] Plaintiff replied August 31, 2024, with a statement that it was willing to dismiss defendant if it would forward the sales information about the trademarked item for which plaintiff had been seeking documentation [*id.*, at A-146], and defendant provided the information September 1, 2024. [*Id.*, at A-145]

In that email, defendant stated: "Therefore, we repeat our final request that you immediately dissolve the TRO by September 3, 2024. Failing that, we will file a motion to lift it. And we will seek attorney fees." [*Id.*] Plaintiff filed its notice of dismissal September 2, 2024. Under Rule 41 of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 41(a)(1)(A)(i), plaintiff's dismissal of defendant became effective upon filing its notice of dismissal.

When defendant elevated the existing restraining order as the matter to address simultaneously with rather than after the parties explored settlement, it gave plaintiff a date by which to do so or face consequences. Plaintiff acceded to that demand within the time identified by the defendant. The district court could have relied upon defendant's voluntarily offered date as a basis to deny its petition and force defendant to bear the consequences of setting terms that plaintiff met.

Defendant presented these facts to the district court and included them in the separate appendix to their Brief. Those facts provided an additional independent basis for the district court to reject the fee petition in its entirety

and for this Court to affirm. (*O'Brien v. Caterpillar, Inc.*, 930 F.3d 923, 928 (7th Cir. 2018))

> 3. Plaintiff Filed and Prosecuted a Typical, not Exceptional, Case in an Appropriate and Professional Manner

It is neither linguistically nor analytically possible for a case to be "typical" and "exceptional," but both defendant and the *amici* characterize this as a "typical" "Schedule A" case. Fees in a Lanham Act case can only be awarded in the discretion of the court if the case was "exceptional."

*Octane Fitness* presents a totality-of-the-circumstances standard, calling for the court to consider whether a given case stands out from others with respect to substantive strength or litigation conduct. 574 U.S. at 554. As this Court explained in *LHO II*, *Octane Fitness* acknowledges that the state of the governing law can inform a judgment whether a given case is "exceptional," but even contrary law does not automatically make an unsuccessful plaintiff's claim exceptional:

> Precedent is distinguished and departed from all the time (and we've even been known to overrule a case now and then!). It is a rare plaintiff who has *no* "bad law" to contend with, and the presence of one "bad case" does not turn an ordinary uphill battle into Pickett's Charge.

*LHO, II*, 988 F.3d at 968; emphasis in original. Similarly, to the extent that defendant disagrees with the conclusions drawn by the district court concerning the prosecution of the case, this Court's focus is on the district court exercise of reason rather than the correctness of each of its various determinations:

Rosemoor disagrees with how the district court weighed the evidence, but discretion to weigh the evidence within the bounds of reason is exactly what a totality-of-the-circumstances test entails. We see no abuse of discretion in the district court's disposal of these arguments.

\* \* \*

Perhaps there is a reasonable way to weigh the facts in Rosemoor's favor. Perhaps there's not. We only need to decide if any reasonable person could agree with the district court's conclusion. We think most would. The district court considered the evidence under the *Octane Fitness* framework and reasonably determined that this case did not qualify as exceptional. It thus did not abuse its discretion in denying Rosemoor's renewed request for attorney fees.

*Id.*, at 970.

Unlike the *LHO* appeals, this case arises on a Record that revealed no controversies prior to defendant's fee petition. Courts have acknowledged since at least *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), that fee requests are not intended to create a "second major litigation," but that is not an invitation for a defendant to skip the first round of litigation entirely in the hope of packing all of its issues and concerns into a fee request, instead.

The issue before this Court is a ruling on a fee petition, not a ruling on a motion to dissolve or modify an order, a motion to dismiss, or any other issues. Defendant learned of the case in mid-July, endured a significant disruption in its affairs for approximately six weeks, and took no steps in court to challenge plaintiff's claims or to seek relief. That was the time for *Hensley's* first "major litigation," but defendant did not litigate.

The district court could have stopped there. The totality of the circumstances include the absence of any challenge to any aspect of this case.

15

In the context of its fee petition, defendant raised challenges to personal jurisdiction. In disposing of the fee petition, the district court addressed the topic, summarizing defendant's argument fairly and accurately, recognizing the intuitive appeal of aspects of the issue as framed by defendant, but concluding, correctly, that the law did not require what defendant wanted it to require and that plaintiff's complaint had been filed with a good faith basis to assert personal jurisdiction. [Dkt. # 89] Under *LHO II*, that was enough.

Defendant's continued pursuit of the point here results from its failure to distinguish a conclusion from a commencement. Ultimately, all parties could see that defendant had not made sales in the United States, but, at the commencement of the case, plaintiff did not have the benefit of the information that proved the absence of sales.[5] The district court found that plaintiff had a good-faith basis for its claims.

There would not have been a need for fee-shift provisions in the Lanham Act or anywhere else if, under common practice, a determination of the merits already automatically entitled the winner to fees. Inasmuch as fee-shift provisions are recognized as departures from the "American rule," the use of

---

[5] As plaintiff explained in connection with defendant's petition for fees [Dkt. # 81], defendant differed from the bulk of the defendants in this case because it transacts its business through different means than others and, as a result, does not leave evidence of sales that is as readily detectable as others. In summary, because it had evidence that defendant offered infringing products (which defendant never contested, even informally) and evidence that purchases could be made from the United States as to some products offered by defendant, plaintiff alleged on information and belief that defendant's contacts supported personal jurisdiction.

the word "exceptional" in the statute is at odds with an argument that every unsuccessful plaintiff has brought an exceptional case.

If it is appropriate to file an action in good faith, there is nothing remotely "exceptional" under the Lanham Act when a plaintiff voluntarily concedes as soon as it finds that its complaint lacks merit. Defendant, however, argues that pursuing *ex parte* relief rendered this case exceptional. [6]

The district court, not plaintiff, entered the orders about which defendant complains. It reviewed the materials submitted, explained its reasons and findings, and set the terms it deemed appropriate in view of the information before it. The court protected defendants and third parties in the manner required by law and as determined in the court's discretion, preserving each defendant's right to contest the plaintiff's allegations and to challenge the propriety and scope of the injunction order.

---

[6] The *amici*, not defendant, suggest that plaintiff's requests for *ex parte* relief were deficient under Rule 65 of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 65, due to an alleged absence of a signed statement from plaintiff's counsel justifying the failure to attempt service on defendants. Plaintiff's application for permission to file documents under seal, signed by plaintiff's counsel, explained why it was necessary to seal its complaint, "Schedule A" to the complaint, plaintiff's federal trademark and trade dress registrations, plaintiff's request and supporting memorandum for temporary restraining order, and plaintiff's declaration in support of its motion for temporary restraining order, together with its supporting exhibits. Counsel stated it was "necessary to prevent the Defendants from learning of these proceedings prior to the execution of the temporary restraining order," as the likely result, if a defendant learned of the proceedings, would be "the destruction of relevant documentary evidence and the concealment or transfer of assets to foreign jurisdictions, which would frustrate the purpose of the underlying law and would interfere with this Court's power to grant relief." [Sep.App. A-42-43]

There is nothing improper or exceptional about a case that presents allegations that a defendant must challenge. The district court's interlocutory orders invited defendant to refute plaintiff's showing of personal jurisdiction, and plaintiff posted a bond to secure claims for damages from an improvidently entered order. [Dkt. # 17]

If it had chosen to do so, defendant had a clear path to consideration of a motion that would seek compensation for damages suffered as a result of an injunction entered against it by a court lacking jurisdiction over it. In order to do so on grounds beyond a challenge to the sufficiency of the plaintiff's allegations, defendant would have needed to present evidence to establish the absence of jurisdiction, which plaintiff would have been required to meet with evidence establishing a *prima facie* basis for personal jurisdiction, unless the court chose to hold an evidentiary hearing, in which case plaintiff would have had to establish personal jurisdiction by a preponderance of the evidence. (*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781-83 (7th Cir. 2003))

It appears that the root of defendant's frustration lies with plaintiff's failure simply to take defendant at its word when defendant claimed that it made no sales of infringing products in the United States. It took one day for plaintiff to act on the information that defendant provided, but it took four weeks for defendant to provide it. Defendant blames plaintiff for those four weeks and, necessarily, accuses the district court of abusing its discretion by not joining it in its outrage.

Defendant fails to appreciate that, in order to move forward from its assertion, it would be necessary under all circumstances for defendant to produce evidence. Defendant took offense and attributed thoughts and motives to plaintiff without realizing that plaintiff's request was routine.

If defendant were to move to challenge jurisdiction, it would need to show proof of the absence of sales. If it wanted plaintiff to consider the merits of a claimed absence of jurisdiction and, on that basis, withdraw its complaint, it would need to show the absence of sales. Finally, if it wanted to negotiate a settlement with plaintiff, it would need to show sales data.

Plaintiff's request was not intended or expected to raise hackles, and it did not seek to impose a burden on defendant. Sales information had either already been provided to counsel or would have been readily retrievable from defendant's data systems.

When it characterized defendant's fee petition as "wildly excessive," the district court found defendant's conduct during the four weeks from plaintiff's request for information to defendant's dismissal to be unreasonable. [Dkt. # 89, p. 4; Deft.App. A-4] Even if there had been a reasonable cause for delay, though, the entire delay lasted less than four weeks after plaintiff requested proof to support the assertion, and that does not reflect improper prosecution.

Although defendant devotes a substantial portion of its brief to a discussion of the law pertinent to personal jurisdiction, there has never been a dispute between the parties over that law. The district court made no ruling on a jurisdictional issue, let alone a ruling impacted by a disagreement over the law.

Stated simply, plaintiff accepts that, in a "Schedule A" case, a plaintiff must have a good faith basis to allege jurisdiction that goes beyond the existence of a website. [Deft. Brief, Issue A, 5, pp. 18-21) Plaintiff also agrees that, if a defendant challenges personal jurisdiction on the basis of contested facts, the district court treats jurisdiction as a threshold issue and requires a plaintiff to provide evidence supporting a *prima facie* claim of personal jurisdiction before subjecting the defendant to further burdens. [*Id.*, Issue A, 4, pp. 15-18]

Plaintiff also acknowledges that, in order to survive a motion to dismiss, a complaint must allege enough facts to state a claim to relief that is plausible on its face or, when the motion to dismiss on jurisdictional grounds is supported by evidence, produce evidence, not just rely on pleadings, supporting the exercise of jurisdiction. (*Id.*, Issue A, 3, pp. 13-15). Finally, plaintiff acknowledges that its claim against defendant was predicated on specific, rather than general, personal jurisdiction, whose standards plaintiff does not contest. (*Id.*, Issue A, 2, pp. 11-13). The district court found that plaintiff had a good-faith basis for its claim.

Even in the context of a fee petition, there was no legal dispute to bring to this Court. Defendant acknowledges that the district court correctly identified the law that would have applied if there had been a contested issue over the permissible reach of the courts' power. (Deft. Brief, pp. 11-13) Defendant also grudgingly concedes, "although in a narrow sense," (*id.*, p. 14) that the district court correctly noted the lack of any authority standing for the proposition that

a plaintiff, from the very outset of the case, must be in possession of facts establishing personal jurisdiction.

Defendant does not address the district court's reliance *Bilek v. Federal Insurance Company*, 8 F.4th 581 (7th Cir. 2021), when this Court recognized that a plaintiff need not be in possession of facts *establishing jurisdiction to a certainty* from the outset of a case. Plaintiff acted properly, not in an "exceptional" manner, when it filed in good faith.

Finally, defendant misconstrues the district court's discussion of jurisdictional discovery and its recognition that, "[a]s a general matter, it is not 'exceptional'—*i.e.*, an obviously erroneous or unreasonable departure from the typical practice—to bring suit in a particular forum even though jurisdiction may depend on facts that the plaintiff lacks because they are only possessed by the opposing party." [Dkt. # 89, page 3] The district court cited a number of cases, including a ruling in another "Schedule A" case in the District that also found that it was not exceptional to make allegations of personal jurisdiction that will depend upon additional proof. [*Id.*, *citing*, *Roadget Bus. Pte. Ltd. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, No. 24 CV 607, 2024 WL 3338942, at * 3-5 (N.D. Ill. 2024)]

It does not matter if, in that process, the district court cited cases that defendant believes to be less supportive of the court's comment. The district court's observation about jurisdictional discovery did not even rise to the level of a "conclusion of law" as expressed in *LHO II*.

The district court recognized and applied the standards announced in *Octane Fitness* and this Court's precedent in connection with the order under review. [Dkt. # 89 at p. 2] Its determination that this was not an "exceptional case" worthy of an award of attorneys' fees was not an abuse of discretion.

II.

"Schedule A" Cases Are Appropriate Vehicles for Judicial Relief
Providing Sufficient Procedural Safeguards

A.    *Standard of Review*

The criticisms of "Schedule A" litigation that fuel defendant's and the *amici's* Briefs are not defects in the law that would render a "Schedule A" case void *ab initio*. A plaintiff must obtain leave to sue under seal and must persuade a court to provide interlocutory relief. Personal jurisdiction, joinder, the adequacy of a complaint, and the merits are matters that a defendant chooses whether to contest.

Defendant made no challenges in the District Court to any aspect of plaintiff's complaint until after the case had been dismissed. On this Record, there are no issues concerning "Schedule A" litigation whose determination would affect the question on appeal whether to affirm denial of defendant's fee petition.

As such, plaintiff sees the arguments of the defendant and the *amici* regarding "Schedule A" litigation as requests for an advisory opinion. Since this Court will not issue advisory opinions, plaintiff respectfully submits that there is no applicable standard of review of that portion of this appeal. (*See*, *Jones v. Griffith*, 870 F.2d 1363, 1366-67 (7th Cir. 1989))

22

B.    *Criticisms of "Schedule A" Cases are Misplaced*

It runs counter to the grain of common judicial experience that a plaintiff could sue hundreds of defendants in one case and dispose of all of its claims by settlement, default, or withdrawal in a manner of months, with trials and dispositive motions arising rarely if at all. Defendant and the *amici* think that there must be something wrong with a system that would work so efficiently, and they believe that they have found defects in the law.

In truth, the system is operating appropriately. Contrary to the assumptions and insinuations offered by critics, the members of the District Court and the attorneys who appear before them understand and fulfill their duties to the best of their ability, and nothing about "Schedule A" litigation leads any member of the District Court to shirk responsibilities or develop a bias in favor of or against parties in "Schedule A" litigation.

That is not to say that "Schedule A" litigation is problem free. First, because of the nature of the claim, the Northern District of Illinois will never be an improper District in which to file such a case, and, thus far, an overwhelmingly disproportionate number of "Schedule A" cases have been lodged in that District. Second, because of the nature of the case, each "Schedule A" case imposes on the calendar of the judge to which it is assigned because it presents requests for relief that must be advanced over other matters and that require the judge to make a discretionary ruling without the benefit of vigorous opposition.

It is beyond plaintiff's place or ability to suggest means to address the currently imbalanced allocation of "Schedule A" cases across the nation. Beyond striving to present their cases as clearly as possible for an efficient review of the issues pertinent to the determination whether to provide interlocutory relief, there is nothing that a plaintiff can do in a typical "Schedule A" case to avoid the administrative burdens that flow inherently from it.

Plaintiff can say that the administrative burdens presented in each "Schedule A" case and the concentration of those cases in the Northern District of Illinois do not and would not be expected to lead to a miscarriage of justice. The number of "Schedule A" cases presented in the District, the number of defendants and third parties impacted by interlocutory orders entered in those cases, and the absence of claims, let alone evidence, that innocent merchants had been denied a fair chance to defend themselves suggest the opposite.

By now, hundreds of thousands of defendants have been served with "Schedule A" complaints after courts have provided *ex parte* relief, secured each time by a bond to ensure compensation for damages resulting from an improvidently entered injunction. The absence of complaint or evidence of innocent merchants improperly or unfairly harmed as a result of an injunction order speaks to the care taken in a typical "Schedule A" case to put together a proper case and the care taken by the members of the District to exercise their discretion wisely, with a view to avoiding unnecessary or undue hardship on defendants and their intermediaries.

1. Overview of "Schedule A" Litigation

The *amici* present "Schedule A" cases in terms of four ominous steps that start with a complaint that they criticize for its lack of particularity. A complaint is far from the first step in a "Schedule A" case, and critics' fears about "Schedule A" cases stem from their failure to consider all of the work that precedes the filing of a complaint.

"Schedule A" cases did not arise from a lawyer's outline that then went looking for a fact pattern. Because of the internet, the process of selling counterfeit goods has changed from the way it used to be.[7] Because of the same internet, the process of catching counterfeiters is different. Because of the internet, the means of confirming the merits of a claim are virtually instantaneous.

The first step in a typical "Schedule A" case is discovery of the fact that a trademark holder's product is being infringed. In simplest terms, an internet search for a trademarked product leads not only to the trademarked product but also to a host of lookalikes that others are selling and offering to consumers who search for the trademarked products. As this case reflects, there might be hundreds of products that strike the trademark holder as knock-offs.

---

[7] Defendant and the *amici* take issue with plaintiff's use of the word "counterfeit," because that word has both a technical and a common meaning. Plaintiff and others in "Schedule A" cases use the term in its common meaning.

The second step in a typical "Schedule A" case is to prepare a case to bring to court. This calls upon a lawyer to anticipate how the case will be prosecuted and to decide which defendants to sue.

It would be self-serving to speak to the character and fitness required of attorneys, generally, let alone to stand up for one's self, so plaintiff approaches the fears of the defendant and the *amici* without asking this Court to presume counsel's inherent sense of honor. Even if one gives no credit to a lawyer's principles, though, the assumption that the prospect of recovery, standing alone, will drive the presentation of the case and lead to overreach is unwarranted.

First, the lawyer drafting a potential plaintiff's complaint does not know the judge who will receive the assignment when the case is filed. Second, the lawyer is preparing a complaint that might name hundreds of defendants, not knowing whether all or any of them would fight a bad-faith or overstated claim. The lawyer has to assume, for each defendant, that a bad-faith or overstated claim will lead to objection. Third, the merits of the claim can be determined virtually immediately. A lawyer has to assume that a bad-faith or overstated claim could be exposed in a motion directed at the interlocutory order that the lawyer asked the court to enter.

Fourth, when preparing a complaint, the lawyer in a typical "Schedule A" case would be expected to understand that, if the plaintiff hoped to secure an *ex parte* order, the judge would have to be able to trust plaintiff's counsel. In the course of making a determination on an item-by-item basis whether the

allegation of infringement is strong enough to warrant relief, a judge would develop a sense whether the lawyer understood and respected the additional responsibilities that a lawyer bears as the sole advocate speaking to the entry of an *ex parte* order. A lawyer choosing to present a claim in bad faith would risk more than the results of one motion.

These factors protect against unduly aggressive allegations. Even an unprincipled lawyer would assume quick exposure, before whatever judge that lawyer feared as the most severe member of the District, of a practice that would stamp the lawyer as an untrustworthy advocate in an area of law that, even more than most, requires a judge to trust the lawyer.

The drafting itself is fairly straightforward. In fact, defendant and the *amici* complain that complaints lack particularized allegations, relying on templates or forms without meaningful customization. Motions for *ex parte* relief also follow a familiar pattern, as the reasons for the need are common—the only way to stop internet counterfeiters is to bring them to court, and the only way to do that is to tie up their businesses temporarily before they close shop and run away.

The wrongdoing challenged in a typical "Schedule A" case occurs by way of the internet, and the risk of customer confusion is discernible from what the internet provides. A plaintiff in a typical "Schedule A" case can show a judge what a consumer would find offered in response to a search for a trademarked item, and that not only serves as a deterrent against an overbroad accusation of infringement but also offers a reasonable basis for an informed assessment

of the request to enjoin each defendant. The focus when drafting the papers in a typical "Schedule A" case is to enable the court to make that assessment as efficiently as possible rather than to offer a customized discussion of the background.

The third step in a typical "Schedule A" case is litigation. The focus shifts to the court rather than the plaintiff or its attorney, because the key event in a typical "Schedule A" case is the entry of an *ex parte* order.

Plaintiff in a typical "Schedule A" case does not control whether a judge grants or denies relief. The requirements and factors generally seen as pertinent to a court's consideration of a motion to proceed under seal and a motion to provide emergency injunctive relief are applicable in a typical "Schedule A" case.

Although defendant and the *amici* suggest that courts routinely or generally grant requests for *ex parte* relief, plaintiff does not understand either the point they think they are making or the statistical evidence that might support their characterization. If plaintiffs achieve a high level of success in motions for *ex parte* relief in "Schedule A" case, that would suggest that plaintiffs are choosing their defendants fairly and accurately and demonstrating that it makes sense for a court to protect their right to prosecute claims without foreclosing any defendant from its defenses.

There would only be a concern if plaintiffs were *unduly* successful when presenting requests for relief. There is nothing to suggest that courts have been biased in favor of plaintiffs and no reason to suspect that they might be.

The fourth step in a typical "Schedule A" case is resolution of the case. Within a relatively short time, a plaintiff in a typical "Schedule A" case will know that certain defendants have not been served and will need to be dismissed without prejudice, that a certain number of defendants have not responded to either the complaint or the interlocutory order, that a certain number of defendants are open to settlement, and that a certain number of claims lack merit. In this case, for example, plaintiff voluntarily dismissed four defendants with prejudice, including defendant Lightzey.

The fourth step involves the parties, without the court. Trials are rare, as is motion practice and extensive discovery. The facts pertinent to the case are available to the parties without need for extensive discovery, and the law is clear.

When the two sides first interact in a typical "Schedule A" case, the defendant knows at least as much as plaintiff knows about the claim. Given the information used to develop a case and already reviewed by the court who determined that an injunction was warranted, one would expect that any dispute would, as here, relate to domestic sales rather than infringement, and, as demonstrated here, those disputes can be resolved readily.

Settlements are between the parties, and the defendant and the *amici* have no reason to speculate about what led to them in this case or whether they were fair. Given the ease with which defendant could contest and informally disprove an insufficient claim, there is no reason to suspect that innocent merchants capitulate rather than establish that they are innocent.

A typical "Schedule A" case is resolved quickly. In this case, plaintiff filed suit May 23, 2024, against 436 defendants, and, by September 18, 2024, the district court had entered its Final Default Judgment Order. [Dkt. # 62] Although a typical "Schedule A" case presents administratively burdensome requests for relief at its inception, it tends not to require resolution of questions of law, discovery supervision, contested dispositive motions, entry of pretrial orders, trials, or post-trial motions.

Criticism of "Schedule A" cases approaches the issue from a belief that plaintiffs, collectively, overstate the extent of the problem that "Schedule A" cases attack and, without additional judicial protections or changes in the law, put innocent merchants at risk. In an actual case or controversy, a court could determine whether a non-infringing merchant had suffered as a result of an improvident order or a non-meritorious claim, but no such party exists here.

Instead, the parties urging reversal rely upon assumptions and hypothesized parties, free of the inherent protections of the legal system in which they seek to apply their conjectured circumstances. They then point to the potential results that might befall that hypothesized party as proof that the law, as applied in the cases that courts have actually confronted, creates a bias that this Court must address.

> 2. Criticism of a Plaintiff's Complaint and Joinder Decision in a Typical "Schedule A" Case is Misplaced

It is ironic that, in an attack against litigation that grew from conduct on the internet, neither defendant nor the *amici* recognize the impact of computers, generally, on the practice of law, particularly the use of forms or "canned"

allegations in an area of litigation that is centered on a well-traveled and well-understood set of common circumstances and facts. Instead of the multi-volume "form books" that used to fill firm libraries, offering court-tested language to inform pleadings and other instruments applicable in well-established subdisciplines of the law, individual lawyers and firms can simply work from internal sources that perform the same function and allow them to concentrate on the aspects of the case that are unique.

The complaint in this case, as in a typical "Schedule A" case, fairly apprised defendants of the nature of the claims against them. They were able to meet the merits of the charges against them quickly, as evidenced by the swift disposition of the case as a whole and the absence of motion practice directed at the pleadings.

Defendant and the *amici* criticize the generalized nature of a typical "Schedule A" case without appreciating the fact that those "generalized" allegations are the reason why joinder is appropriate. In this case, plaintiff claimed that its "generalized" allegations applied to each of the defendants.

The plaintiff and each defendant know whether the plaintiff holds a valid trademark that it seeks to protect, whether internet counterfeiting has developed to the point of a known and understood operation, whether search engines enable counterfeiters to flourish and enable trademark holders to identify them, and whether the intermediaries' role in the business of internet counterfeiting warrants injunctive relief that extends to intermediaries who become aware of an injunction. When a plaintiff files a complaint and presents

a request for *ex parte* relief, however, the court does not know if every defendant agrees with the plaintiff's claimed ownership or any of the other issues that the defendant and the *amici* describe as generalized.

Those are considered open issues calling, ultimately, for decision. They are common to the merits of all of the claims against all of the defendants in a typical "Schedule A" case. They are also common questions to a determination whether the circumstances as to each defendant warrant an *ex parte* order.

Rule 20 of the Federal Rules of Civil Procedure, Fed.R.Civ.P.20, draws from a long history recognizing the benefits of judicial economy. It assists the administration of justice, and a defendant is free to seek separation from the defendants with which it has been joined. On its own, the court is free to examine joinder in a case.

Although some members of the District have voiced concern about the numbers of defendants being sued in a single case, the problem is not joinder but the number of defendants who have been caught selling a counterfeit of a plaintiff's product. The internet essentially creates a single marketplace, and a typical "Schedule A" case identifies merchants in that marketplace caught selling counterfeits of one legitimate merchant's goods.

To plaintiff's mind, internet counterfeiting is analogous to mass looting in a business establishment. If a store owner identified all of the looters and wanted to sue them, one would expect one complaint, since the store owner's right to exclude trespassers and thieves and the fact of the mass disturbance are issues common to all claims for relief, regardless whether there were 10, 100,

or more people identified as causing damage or walking out with store property and regardless of the individual reasons or circumstances that led the defendants to do what they did.

Joinder is directed at judicial economy and efficiency. The relevant question is whether it makes sense in a given matter to proceed with fewer defendants than the plaintiff originally named.

An artificially imposed limit on the number of defendants who can be joined in a given "Schedule A" case will not enhance the administration of justice in the District. There are two predictable results of an artificial limit, depending on the nature of the limit imposed on the number of available defendants.

One type of restriction would be limited to joinder. The other would seek to prohibit a plaintiff from asking the same judge to consider more than a preset number of defendants, regardless of the number of distinct cases addressing the plaintiff's claims of infringement.

An artificial limit on the number of defendants who could be joined in a "Schedule A" case would likely lead to the filing of multiple "Schedule A" cases on the same day, each one respecting the joinder limit. In all but the first-filed case, plaintiff would ask the Executive Committee of the District to re-assign or consolidate the later-filed cases in order to ensure that one judge decided the questions of fact and law common to all cases. Since all of the cases present requests for emergency relief, all of those motions would likely be assigned to one judge for disposition, too, whether or not the cases would return to the calendars of their originally assigned judges for further proceedings. In each

extra case that had to be opened, there would be a need to maintain a docket and to ensure that orders disposing of the case had been entered.

A hard limit on the number of defendants a court could consider in a given plaintiff's "Schedule A" case would be worse. Instead of reviewing a request for *ex parte* relief in a case like this with 436 comparisons between allegedly infringed and allegedly infringing products, a court's examination of the products would be limited to whatever number had been set. A second, third, fourth, or further judge would independently do the same work, comparing the same allegedly infringed product with however many allegedly infringing products are permitted to be included in the case or cases assigned to that judge.[8]

At the same time, each judge could expect to receive a proportionate share of however many additional "Schedule A" cases that had to be filed as a result of the artificial limit imposed on the number of available defendants in a single internet counterfeiting case. There would still be the same number of comparisons that need to be made in the District, but more judges would speak to the issues pertinent to each plaintiff's pursuit of counterfeiting, setting aside all other work each time and proceeding on an emergency basis. Each case on each calendar would require administration as well as adjudication or at least evaluation of emergency motions.

---

[8] Depending on the limit established, there might be so many cases filed for a given plaintiff that the process of random assignments, limited by the number of potentially available judges, leads to multiple cases being assigned to a single member of the District.

That restriction presents the possibility of inconsistent rulings on motions seeking *ex parte* relief predicated on the same trademarked products. The nature of discretionary authority rests on the understanding that reasonable people can come to different conclusions, and there is never a reason to presume how a court will choose to exercise its discretion. If the number of defendants who are subject to a given ruling is the end all and be all of how judicial resources are allocated, it is inevitable that, in any given "Schedule A" controversy that has been aspirated onto separate calendars, judges might respond differently from one another regarding the scope of the threat, the absence of better alternatives, or any other number of factors that, in the absence of artificial limits on joinder, would be considered once.

Compared with either alternative, joinder obviously benefits the court, but any defendant in any case can challenge joinder. "Misjoinder" is not an issue or a circumstance that needs to be changed, even if, in a given matter, the number of defendants and the time needed to address a motion that reduces itself to a side-by-side comparison several hundred times might lead to expressions of concern or frustration among those required to set aside all other business to do so.

3. There is No Basis to Presume or Fear Erroneous Determination of Requests for *Ex Parte* Relief in a Typical "Schedule A" Case

Acting alone, judges decide whether a given motion should be granted or denied based on the papers submitted to the court. When someone suggests that there is an imbalance in the law evidenced by the fact that judges "routinely" grant emergency motions and that plaintiffs flock to the District as

a result, there is an implicit suggestion that, across the board, the judges are not doing their jobs.

If a judge in a typical "Schedule A" case properly evaluates the motions presented and, as a result, chooses to provide *ex parte* relief, the system is working properly and fairly. If judges properly evaluate the circumstances, properly apply the law, and choose to provide *ex parte* relief in 50 cases, one would point to that record as a sign of the system's success. The defendant and the *amici* do not explain why that success becomes a failure or a worry when it happens "generally" or "routinely" when measured against thousands of decisions.

There is no guarantee that a judge will grant an emergency request for relief. The defendant and the *amici* quote freely from a decision of a member of the District in *Eicher Motors, Ltd. v. Partnerships and Associations Identified on Schedule "A,"* __ F.Supp.3d __, 2025 WL 2299593, Case No. 25-cv-02937 (N.D. Ill. 2025), but they do not see that *Eicher* undercuts their arguments. The court denied that plaintiff's request for emergency relief.

The fear that the defendant and the *amici* present is that judges, overwhelmed by the spate of "Schedule A" cases and the number of defendants in each one, will simply give up and approve unworthy requests for interlocutory relief. They offer no reasons to justify such a fear.

First, despite plaintiff's discomfort in having to point it out, there is the protection that comes with the honor of the judicial officers who preside over

"Schedule A" cases. Anything further from plaintiff on that score would be gratuitous.

Second, if one is willing to indulge in supposition that a judge's personal level of fatigue or struggle with a certain type of case is going to impact that judge's decision-making, one ought to have a reason to predict that the impact is going to fall in one direction rather than the other. Defendant and the *amici* offer no basis to fear that, if judges' personal fatigue or struggles impacted their decisions, those decisions would unfairly favor plaintiffs rather than defendants.

The default position under the law is to deny a request for relief unless the proponent establishes that the request is meritorious. An *ex parte* order is a jealously guarded form of relief, never given lightly. One would expect that, if someone were overwhelmed by the onslaught of "Schedule A" cases and their demands on time, the tendency of someone who felt compelled to rule without giving a full consideration of the merits would be to deny rather than grant relief, but perhaps that reveals more about plaintiff's counsel than anything else.

Certainly, it is counter-intuitive to think that someone overburdened by the volume of business that resulted from existing rumors that *ex parte* orders were relatively easy to obtain would then choose to make *ex parte* orders unduly easy to obtain. To find a basis to declare a crisis, however, the defendant and the *amici* posit a District rife with judges who would succumb to

pressure, then act against their self-interest, resulting in an overabundance of *ex parte* orders.

4. There is No Unfair Advantage or Leverage Secured by a Plaintiff in a Typical "Schedule A" Case Resulting from Entry of an *Ex Parte* Order

The *ex parte* orders that a judge enters in a typical "Schedule A" case are impactful. They are not unfairly impactful, however. They do not force a defendant into unfavorable settlement or surrender.

Defendant Lightzey did not settle. It claims that more than $180,000 had been tied up, and it received a settlement offer from plaintiff for $2,000 in the blind, subject to adjustment if defendant provided sales figures warranting a lower figure. Hundreds of other defendants served with the *ex parte* order ignored this case entirely, leading to default judgments against nearly 300.

Nobody before this Court can speak to the reasons why some defendants settled in this case. The work that goes into a pre-filing investigation and the independent review reflected in the district court's order suggest a high probability that a defendant would understand that it had been caught infringing, and, if so, settlement would be smarter than resistance. The ease with which defendant Lightzey secured vindicating evidence and the dismissal that followed immediately confirms that there were no structural barriers to fair resolution that would have deterred an innocent defendant from challenging rather than acceding to plaintiff's claims.

For any defendant framing its choices in terms solely of settlement or formal litigation with no opportunity for immediate informal vindication, there is an expense associated with litigation in American courts. In most instances, there

is no prospect of recouping significant elements of those costs even if claims brought in good faith against a defendant ultimately fail. When litigation is inherently burdensome and expensive, it is hard to see a significant impact of an *ex parte* order on an innocent defendant's cost-benefit assessment of settlement versus litigation.

The defendant and the *amici* suggest that "Schedule A" cases create a disturbance in the commercial relationships between defendants and the intermediaries with whom they work to get their goods to the internet marketplace. They say that intermediaries overreact on receipt of an *ex parte* order and cause some defendants more economic harm than a typical "Schedule A" case plaintiff could have imposed on them even if it pursued them to judgment. They fear that some intermediaries simply terminate their business relationships entirely with a defendant.

If defendant and the *amici* are correct when they assert that intermediaries overreacted to something, the intermediaries would be the cause of what followed from their actions and would answer to the people who claimed to have suffered as a result. The professed victims of overreactions and the intermediaries are not before this Court.

The assumption that intermediaries overreact stems from the assumption that large numbers of innocent merchants are being unfairly swept up in a typical "Schedule A" case. Another scenario is plausible—when an internet intermediary receives notice of an *ex parte* order, the intermediary has access to its own records, can make an independent assessment whether a defendant

is offering counterfeit goods on the internet, and, availing itself of that opportunity, determines that a defendant sells counterfeit goods and is no longer a welcome user of the intermediary's platform.

The defendant and the *amici* complain that there are internal procedures that the intermediaries establish to adjudicate allegations of counterfeiting. Those procedures afford an opportunity for an accused merchant to be heard before suffering adverse impacts on its business, but defendant and the *amici* claim that an *ex parte* order in a typical "Schedule A" case leaps past those procedures and subjects a merchant to consequences without the benefit of the intermediary's internal procedures.

Assuming that to be the case, intermediaries have business interests broader than their internal adjudicatory procedures. One of those interests is establishing the reliability and integrity of the marketplaces that the intermediaries provide, and a counterfeiter is a threat to that interest. If an intermediary learns independently of its internal procedures that a merchant is a counterfeiter, it may well decide, as a business matter, that it is better off removing the merchant and affirming the integrity of the market. That decision could be tested in an appropriate case or controversy.

The bare assertion that intermediaries overreact in an unfair way to the orders entered by the courts has not been developed for serious consideration, even in the context of the pursuit of an advisory opinion highlighting purported problems with the typical "Schedule A" case.

5. A Fee Shift Here Would Represent a Change in Law for Congress, not this Court, to Consider

The *amici* sought permission to participate in this case after having had an opportunity to consider defendant's Brief. They know that the district court found defendant's fee petition to be wildly excessive and unreasonable and that defendant did not challenge those findings.

Knowing as much, the *amici* embrace the unreasonable fee demand of defendant as a tool that this Court should employ to send a message simultaneously dissuading plaintiffs from pursuing claims and drawing defendants to fight them. News of an unwarranted award of a wildly excessive amount of money can always be expected to draw a crowd, but that is hardly a reason to depart from settled law.

Plaintiff discussed the *Octane Fitness* issue above. Measured against the highly deferential standard of review expressed in *LHO II*, reversal of the district court here means that, when a plaintiff files but loses a good-faith complaint in a typical "Schedule A" case, a district court must find the case to be exceptional enough to award fees.

If defendant and the *amici* want to change the law to require a plaintiff to pay fees under the circumstances presented here, their remedy is with Congress. The Supreme Court has interpreted existing law, this Court has consistently applied it, and a departure from it just to send a message or incentivize behavior in other cases is not something that any court is going to embrace.

A "typical" case does not become an "exceptional" case just because someone dislikes the law that allows the plaintiff to file it.

6. The Defendant and the *Amici* Do Not Offer Meaningful Solutions to the Administrative Burdens They Cite as the Reasons for Their Recommendations

As discussed above, restriction of joinder offers false hope for a battle to thwart "Schedule A" litigation. Taking one case of 436 defendants and turning into 436 separate but related cases, or 218 separate two-defendant cases or even five cases with up to 100 defendants apiece will not materially change the plaintiffs' collective pursuit of injunctive relief, but it will create an administrative havoc that will make the administration of civil justice in the District exponentially more cumbersome.

The *amici* argue, however, that the filing fees generated by restricting joinder will do the trick, because the expense of prosecuting a typical "Schedule A" case will increase by $450 for every separate lawsuit that a plaintiff has to open. Filing fees, however, are not intended to fund the government or serve as a revenue or profit center, although they are used to offset the appropriations requirement. (Barry J. McMillion, "Courts, Programs, and Other Items Funded by Congressional Appropriations for the Federal Judiciary," Congressional Cong.Rsch.Serv. IF 12586, February 7, 2024).

In Fiscal Year 2023, Congress appropriated $8.46 billion for the federal judiciary. (*Id.*) If there were 5,000 new "Schedule A" cases filed each year, and each one were aspirated into single-defendant lawsuits with separate $450

filing fees, each one of those pre-aspirated cases would need 3,760 defendants in order to generate $8.46 billion in filing fees.

The mere fact of an annual Congressional appropriation confirms that the financial burdens of judicial administration exceed the revenues generated by filing fees and compels the conclusion that aspiration of a typical "Schedule A" case would only strain the national budget, since each case already imposes a burden beyond the filing-fee offsets. The commercial analogy to the suggestion of using artificial joinder rules to raise money is selling each item at a loss and hoping to make it up through volume.

More importantly, the filing fees in a successful suit are recoverable, and the added expense of filing fees would simply be amortized in a plaintiff's settlement demands and expectations in a typical "Schedule A" case, raising the cost of defense and of settlement for the defendants. There is no reason to expect that a plaintiff would absorb rather than recoup the expenses imposed as a result of an artificial limit on the number of defendants permitted in a typical "Schedule A" case.

A significant factor overlooked by defendant and the *amici* is the need for a plaintiff in a typical "Schedule A" case to pursue a claim once it learns that others are exploiting its protected property. The choice for a potential plaintiff in a trademark case is not whether it will ultimately recover $450 from the defendant that it is considering suing.

Instead, the question is whether it is worth it to risk a defense in another case that the trademark holder abandoned its property rights when it chose

not to prosecute a valid claim for infringement just because that claim would have cost the party $450 to file, recoverable upon successful conclusion of the case. A trademark holder has a duty to police or risk a finding of abandonment of its mark, 15 U.S.C. § 1127, and it runs the risk of *laches* and acquiescence defenses as to any defendant that plaintiff might choose to sue later or those trafficking with that defendant's products. (*Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939-41 (7th Cir. 2016))

Changing the fee-shifting provisions of the Lanham Act will not reduce the volume of "Schedule A" filings, either. A relaxation of the *Octane Fitness* standards would only increase the amount of work attendant to a typical "Schedule A" case, as it would invite more defendants in "Schedule A" cases to present post-resolution petitions, leading to more contested motions, longer disposition times on pending motions, and revisitation of pleadings and submissions that had been filed in cases that had already been prosecuted and resolved.

A typical "Schedule A" case plaintiff still proceeds from what it sees as a solid list of infringing defendants that is then vetted by counsel and will be reviewed independently by a judge before any defendant is served. The plaintiff has an obligation to police its intellectual property and, before filing, has a high degree of confidence that it will win each side-by-side comparison on which its case depends. Even if some claims fall short, the overwhelming majority will succeed, and, if there is a good-faith reason to believe a claim will be

successful, the plaintiff would be wise to have a court rule rather than risk a claim that it permitted an infringing product to go scot-free.

The true risk of an incorrect allegation would not be as dramatic as defendant and the *amici* envision. Fees awarded to a successful defendant would be limited to the reasonable fees incurred with the exercise of billing judgment, not the wildly excessive amounts requested here.

Whether such a strict-liability provision would lead to adjustments in a given potential complaint or decisions not to include particular defendants within an action, a typical "Schedule A" case sues scores or hundreds of defendants who revealed themselves by finding their way into the results when someone searched for the plaintiff's protected goods. There will still be a "Schedule A" case with scores or hundreds of defendants who appear to the plaintiff to be infringing and who present no signs of being innocent.

A typical "Schedule A" case does not give rise to a contested fee petition. Cases are resolved by default, by settlement, and by voluntary dismissals. There is no empirical basis to claim that the threat of plaintiff's fees is a motivating factor that dominates or even influences a defendant's decision to settle a typical "Schedule A" case.

<u>Conclusion</u>

For these reasons, plaintiff requests that this Court affirm the district court's order [Dkt. # 89] denying defendant's post-dismissal petition for attorneys' fees.

Respectfully submitted,

_/s/ Joseph E. Tighe_____
Attorney for Plaintiff-Appellee

JOSEPH E. TIGHE
Reyes Kurson, Ltd.
216 South Jefferson Street, Suite 602
Chicago, IL 60661
(312) 332-0055
(312) 332-0419 (fax)
jtighe@rkchicago.com

*Counsel of Record*

ZAREEFA B. FLENER
JAMES E. JUDGE
YING CHEN
Flener IP Law, LLC
77 West Washington Street, Suite 800
Chicago, IL 60602
(312) 724-8874
zflener@fleneriplaw.com
jjudge@fleneriplaw.com
ying@fleneriplaw.com

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies, pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, that this Brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because the Brief contains 11,904 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

The undersigned further certifies that this Brief complies with the typeface requirements of Rule 32(a)(5) and type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 12-point Bookman Old Style font.


October 14, 2025                          _/s/ Joseph E. Tighe_____
                                          Joseph E. Tighe

## **Certificate of Service**

JOSEPH E. TIGHE, counsel of Record for Appellee, certifies that, on October 14, 2025, he caused true and correct copies of the above and foregoing Notice of Filing and of the Brief submitted to the Clerk of the Court for the Seventh Circuit Court of Appeals to be served by email upon counsel for the parties herein at the addresses set forth below:

| | |
|---|---|
| J. Benjamin Bai | Wesley E. Johnson |
| King & Wood Mallesons, LLP | Cross-Border Counselor LLP |
| 500 Fifth Avenue 50th Floor | wjohnson@cbcounselor.com |
| New York, NY 10110 | |
| Benjamin.bai@cn.kwm.com | *Counsel for Amici* |

Haolu Feng
King & Wood Mallesons
17th Floor, One ICC, Shanghai ICC
999 Middle Huai Hai Road, Xuhui District
Shanghai 200031 China
Harry.feng@cn.kwm.com

*Counsel for Appellant*

/s/ Joseph E. Tighe

October 14, 2025                Joseph E. Tighe