No. 25-2048

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

LOUIS POULSEN A/S,

*Plaintiff-Appellee,*

v.

LIGHTZEY,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the Northern District of Illinois
No. 24 CV 4260, Judge Jorge Alonso

---

## BRIEF OF *AMICUS CURIAE*
## STRATEGIC ALLIANCE FOR FAIR ECOMMERCE, NFP
## IN SUPPORT OF APPELLEE AND AFFIRMANCE

Christopher W. Carmichael
**HENDERSON PARKS, LLC**
90 Canal Street, Fourth Floor
Boston, MA 02114
Tel: (617) 936-0795

*Counsel for Amicus Curiae*
**Strategic Alliance
for Fair Ecommerce, NFP**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2048

Short Caption: Poulsen A/S v. Lightzey

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Strategic Alliance for Fair Ecommerce (an Illinois non-for-profit corporation)

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Henderson Parks, LLC

(3)   If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No publicly held corporation owns 10 percent or more of its stock.

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: Christopher Carmichael            Date: October 21, 2025

Attorney's Printed Name:  Christopher Carmichael

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]   No [ ]

Address:  90 Canal Street, Fourth Floor, Boston, MA 02114

Phone Number: 617-936-0795            Fax Number:  617-936-0796

E-Mail Address: ccarmichael@henderson-parks.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF INTEREST OF AMICUS CURIAE ...................................................- 1 -

SUMMARY OF THE ARGUMENT ...........................................................................- 2 -

ARGUMENT.............................................................................................................- 0 -

I.   THE SYSTEMIC CRISIS FACING U.S. INTELLECTUAL PROPERTY RIGHTS
OWNERS: OFFSHORE ECOMMERCE OPERATORS ...................................................- 2 -

   A.   The Global Trade and Significant Harms of Ecommerce Sales of Infringing and
   Counterfeit Goods...........................................................................................- 3 -

   B.   The Practical Inability to Enforce Intellectual Property Rights Against Offshore
   Ecommerce Store Operators ...........................................................................- 6 -

II.   SCHEDULE A LITIGATION IS AN EFFECTIVE AND MODEL PRACTICE FOR
ENFORCING INTELLECTUAL PROPERTY RIGHTS ...................................................- 8 -

   A.   Schedule A Litigation Deters Future Intellectual Property Violations ............- 9 -

   B.   Appellate Courts Have Upheld Procedural Aspects of Schedule A Litigation ...-
   14 -

   C.   Schedule A Cases Are Efficient and Reduce the Burden on the Courts.........- 16 -

CONCLUSION .........................................................................................................- 17 -

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*4 Pillar Dynasty LLC v. N.Y. & Co.,* 933 F.3d 202 (2d Cir. 2019) ............................ 12

*ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Sched. "A,"* 2025 U.S.
App. LEXIS 20651 (Fed. Cir. 2025) ................................................................. 14, 15

*ABC Corp. I v. P'ship & Unincorporated Ass'ns. Identified on Sched. "A,"* 52 F.4th
934 (Fed. Cir. 2022) ................................................................................................ 14

*Am. Can Co. v. Mansukhani,* 742 F.2d 314 (7th Cir. 1984) ...................................... 16

*Am. Girl, LLC v. Zembrka,* 118 F.4th 271 (2d Cir. 2024) .......................................... 14

*Animale Grp. Inc. v. Sunny's Perfume Inc.,* 256 F. App'x 707 (5th Cir. 2007) .......... 15

*Brooks v. Ross,* 578 F.3d 574 (7th Cir. 2009) ............................................................ 15

*Chrome Cherry Ltd. v. P'ships & Unincorporated Ass'ns Identified on Sched. "A,"*
No. 21-cv-05491, 2021 WL 6752296 (N.D. Ill. Oct. 20, 2021) ................................. 9

*CSC Holdings, Inc. v. Redisi,* 309 F.3d 988 (7th Cir. 2002) ...................................... 15

*Deckers Outdoor Corp. v. P'ships & Unincorporated Ass'ns Identified on Sched. A,*
2013 U.S. Dist. LEXIS 205985 (N.D. Ill. Oct. 30, 2013) ........................................ 10

*Denius v. Dunlap,* 330 F.3d 919 (7th Cir. 2003) .......................................................... 2

*Dyson Tech. Ltd. v. David 7 Store,* 132 F.4th 526 (7th Cir. 2025) ......................... 3, 14

*Emoji Company GmBH v. The Individuals et al.,* 1:21-cv-1739 (N.D. Ill. Mar. 31,
2021), ECF No. 80 .................................................................................................... 1

*Entm't One UK Ltd. v. 2012shiliang,* 384 F. Supp. 3d 941 (N.D. Ill. 2019) .............. 13

*Estate of Bishop v. Equinox Int'l Corp.,* 256 F.3d 1050 (10th Cir. 2001).................... 12

*First Tech. Safety Sys., Inc. v. Depinet,* 11 F.3d 641 (6th Cir. 1993) ........................ 16

*Gillespie v. Civiletti,* 629 F.2d 637 (9th Cir. 1980) .................................................... 15

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ...................................... 15

*In re OnePlus Technology (Shenzhen) Co.*, 2021 WL 4130643 (Fed. Cir. Sept. 10, 2021) ................................................................................................................... 16

*Jergenson v. Inhale Int'l Ltd.*, 2024 U.S. App. LEXIS 25278 (7th Cir. Oct. 7, 2024) ................................................................................................................... 14

*Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584 (7th Cir. 1989) ......................... 2, 9

*Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2015 U.S. Dist. LEXIS 78961 (N.D. Ill. June 18, 2015) ......................................... 13

*Matter of Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979) .......................................... 16

*Menominee Indian Tribe v. Thompson,* 161 F.3d 449 (7th Cir. 1998) ........................ 2

*Merch Traffic, LLC v P'ships & Unincorporated Ass'ns Identified on Sched. "A",* No. 25-cv-01180 (N.D. Ill. Apr. 17, 2025), ECF No. 36 ................................................ 17

*Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494 (5th Cir. 2018) .................. 16

*NBA Props. v. HANWJH*, 46 F.4th 614 (7th Cir. 2022) .............................. 3, 8, 13, 14

*Neman Bros. & Assocs. v. P'ships & Unincorporated Ass'ns Identified in Schedule A,* 2024 U.S. Dist. LEXIS 223383 (N.D. Ill. Dec. 10, 2024) ....................................... 17

*Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d (9th Cir. 1992) .............. 15

*Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ................... 16

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ....................... 16

*River Light V, L.P. v. Zhangyali*, 2016 U.S. Dist. LEXIS 111301 (N.D. Ill. Aug. 22, 2016) .......................................................................................................................... 13

*Toyota Motor Sales, U.S.A., Inc. v. P'ships & Unincorporated Ass'ns Identified on Sched. "A,"* No. 1:24-cv-04331 (N.D. Ill. Aug. 9, 2024), ECF No. 54. ............... 10, 11

*Viahart, L.L.C. v. GangPeng*, 2022 WL 445161 (5th Cir. Feb. 14, 2022) ........... 14, 16

*Volkswagen AG v. iman365-usa*, 2020 U.S. Dist. LEXIS 34218 (N.D. Ill. Feb. 28, 2020) ............................................................................................................ 13

*World Wrestling Ent., Inc. v. Unidentified Parties*, 770 F.3d 1143 (5th Cir. 2014) .. 15

**Other Authorities**

*Best Practices*, SAFE BAR ASS'N, https://safeip.org/best-practices/ (last visited Oct. 16, 2025) ................................................................................................................. 17

*Counterfeit Goods: A Danger to Public Safety*, U.S. IMMIGR. & CUSTOMS ENF'T, https://www.ice.gov/features/dangers-counterfeit-items (last updated Aug. 19, 2025) ..................................................................................................................... 5

Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157 (2020) ........................................................................ 7

DEPT. OF HOMELAND SECURITY, *Combating Trafficking in Counterfeit and Pirated Goods; Report to the President of the United States* (Jan. 24, 2020), www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf. ............................................................................... 2, 6, 7, 8

Elizabeth Banegas, *Schedule "A" Cases. Not Sad at All*, 65 IDEA: L. REV. FRANKLIN PIERCE CTR. FOR INTELL. PROP. 107 (2024). ................................................... 8, 9, 17

Eric Goldman, *Amicus Brief Urges Seventh Circuit to Award Attorneys' Fees in SAD Scheme Case*–Louis Poulsen v. Lightzey, TECH. & MKTG. L. BLOG (Sept. 11, 2025), https://blog.ericgoldman.org/archives/2025/09/amicus-brief-urges-seventh-circuit-to-award-attorneys-fees-in-sad-scheme-case-louis-poulsen-v-lightzey.htm. ....... 1, 2

Eric Goldman, *SHOP SAFE Act Reintroduced, Because Some Congressmembers Really Want to Kill Online Marketplaces*, TECH. & MKTG. L. BLOG (Sept. 29, 2023), https://blog.ericgoldman.org/archives/2023/09/shop-safe-act-reintroduced-because-some-congressmembers-really-want-to-kill-online-marketplaces.htm .................... 6

Eric Goldman, *The SHOP SAFE Act Is a Terrible Bill That Will Eliminate Online Marketplaces*, TECH. & MKTG. L. BLOG (Nov. 15, 2011), https://blog.ericgoldman.org/archives/2021/09/the-shop-safe-act-is-a-terrible-bill-that-will-eliminate-online-marketplaces.htm .......................................................... 6

Eric Goldman, *Why I Oppose the Stop Online Piracy Act (SOPA) / E-PARASITES Act*, TECH. & MKTG. L. BLOG (Nov. 15, 2011), https://blog.ericgoldman.org/archives/2011/11/stop_online_pir.htm ......................... 6

*Fashion Industry Study Reveals Dangerous Chemicals, Heavy Metals in Counterfeit Products*, AM. APPAREL & FOOTWEAR ASS'N (Mar. 23, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/Fashion_Industry_Study_Reveals_Dangerous_Chemicals_Heavy_Metals_Counterfeits.aspx ... 5

John H. Zacharia & Kari Kammel, *Congress's Proposed E-Commerce Legislation for Regulation of Third-Party Sellers: Why It's Needed and How Congress Should Make It Better*, 21 U.C. DAVIS BUS. L. J. 92 (2020) .................................................... 6

Kari Kammel & Jessica Boeve, *Beyond the Brick-and-Mortar Paradigm: The Legal and Procedural Foundations of Schedule A Litigation in Combating Online Counterfeiting as Distinct from Traditional Trademark Enforcement*, (September 19, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5508098 ..... 8, 9, 17

Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. CENSUS BUREAU (Apr. 27, 2022), https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html ................................................................................................ 3

Saleem Alhabash et al., MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT., *Global Anti-Counterfeiting Consumer Survey 2023: A Country Study* 41 (2023), https://a-capp.msu.edu/wp-content/uploads/2024/10/GlobalConsumerSurvey2023_PublicFinal.pdf ................. 5

U.S. CUSTOMS & BORDER PROT., PUB. NO. 3964-0125, INTELLECTUAL PROPERTY RIGHTS SEIZURE STATISTICS (2024), https://www.cbp.gov/sites/default/files/2025-01/IntellectualPropertyRightsSeizureStatisticsFiscalYear2024%20FINAL.pdf (last modified Jan. 16, 2025) ...................................................................................... 4

U.S. DEP'T OF COM., INT'L TRADE ADMIN., *Impact of COVID Pandemic on eCommerce*, https://www.trade.gov/impact-covid-pandemic-ecommerce (last accessed Oct. 8, 2025) ................................................................................................ 4

U.S. DEP'T. OF COM., *Quarterly Retail E-Commerce Sales 4th Quarter 1 CB25-26* (Feb. 19, 2025), https://www2.census.gov/retail/releases/historical/ecomm/24q4.pdf ....................... 4

**Rules**

Fed. R. Civ. P. 4(f)(3) ............................................................................ 14, 16

<u>**STATEMENT OF INTEREST OF AMICUS CURIAE**</u>

Strategic Alliance for Fair Ecommerce, NFP (SAFE) is a bar association comprised of a dedicated coalition committed to advancing the protection of intellectual property rights in ecommerce.  SAFE brings together legal practitioners to develop and promote best practices for litigation involving offshore infringers that unfairly violate intellectual property rights.  Its mission is to address the unique challenges of online intellectual property disputes, ensuring fair, efficient, and effective outcomes in an ever-evolving ecommerce landscape.  The coalition advances thought leadership and collaboration among stakeholders to protect brand innovation and consumers. By enforcing intellectual property rights online, brands aim to shield consumers from deceptive practices, support legitimate sellers who adhere to legal standards, and foster a transparent and trustworthy online shopping environment.

SAFE has no financial or personal interest in the outcome of this appeal.  No party's counsel authored the brief, in whole or part, and no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief.  No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## <u>SUMMARY OF THE ARGUMENT</u>

SAFE supports Appellee Louis Poulsen. The District Court's May 28, 2025, Order denying Appellant's fee petition should be affirmed. The decision was not an abuse of the district court's discretion. The underlying litigation is not properly under review. Were that litigation reviewed, it should be concluded that such litigation furthers the rights of intellectual property owners in pursuing meritorious claims against offshore ecommerce marketplaces illegally exploiting their intellectual property.

# ARGUMENT

Appellant appealed the May 28, 2025, order denying an award of attorneys' fees to Appellant under the Lanham Act. A final judgment was entered nine months prior (on September 18, 2024) and Appellant was dismissed from the case before that judgment was entered and no appeal was filed. Both Appellant and its supporting Amici stray from the issue on appeal to attack the underlying litigation and seek to use this appeal as a platform to air grievances against intellectual property enforcement lawsuits that have become known as "Schedule A" litigation. But, only the fee issue (listed as issue "B" in Appellant's brief) is properly under review. [DE 16, pg. 2]. The other issues raised by Appellant and the two law professor *Amici* should not be considered. To the extent those issues are considered, SAFE submits that both are incorrect about the conclusions they reach.

The underlying litigation involved trademark infringement or counterfeit goods, *i.e.*, goods that purport to be genuine and from the intellectual property holder. The global trade in counterfeit, pirated, or otherwise infringing goods is a $467 *billion* dollar industry fueled by offshore ecommerce store operators. Federal counterfeit enforcement litigation is one of the few effective mechanisms available and uniquely designed to combat this problem and provide meaningful relief to IP owners. At the same time, enforcement litigation protects consumers and the economy from the real and significant harms of online infringement and counterfeiting. This type of

counterfeit enforcement litigation is neither new nor unexamined, and its procedural aspects have been confirmed as legally sound and effective for over a decade.

Despite the recognized problem of online counterfeiting, a few academics (including the law professor *Amici*) have been authoring papers criticizing counterfeit enforcement litigation, what they refer to as "Schedule A" lawsuits. The papers are not based on any extensive experience in online brand protection, litigating Schedule A cases, or comprehensive studies. Instead, the papers present the negative viewpoint that this type of litigation is bad, based on speculation and unsupported assumptions. Unlike litigation, in academic writing there is no opposing side and so the papers are able to cite a handful of outlier cases while omitting or ignoring other relevant precedent. The Amicus Brief supporting Appellant, for example, only cites to four cases despite acknowledging that "thousands of intellectual property infringement suits over roughly the past decade" have been filed. [DE 25, pg. 4]. At least one of the two listed law professor Amici has appeared in support of a Schedule A defendant as an expert witness[1] and solicits defendants[2] to contact him in appeals for the chance to "get some precedential wins."

---

[1] Amici appeared as an "expert witness" in: *Emoji Company GmBH v. The Individuals et al.* Declaration of Eric Goldman in Support of Defendant's Motion for Attorney Fees, *Emoji*, 1:21-cv-1739 (N.D. Ill. Mar. 31, 2021), ECF No. 80.

[2] Eric Goldman, *Amicus Brief Urges Seventh Circuit to Award Attorneys' Fees in SAD Scheme Case–* Louis Poulsen v. Lightzey, TECH. & MKTG. L. BLOG (Sept. 11, 2025), https://blog.ericgoldman.org/archives/2025/09/amicus-brief-urges-seventh-circuit-to-award-

## I.   THE SYSTEMIC CRISIS FACING U.S. INTELLECTUAL PROPERTY RIGHTS OWNERS: OFFSHORE ECOMMERCE OPERATORS

This Circuit has recognized since the 1980s that "the sale of counterfeit merchandise has become endemic -- perhaps pandemic . . . ." *Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584, 588 (7th Cir. 1989).  While infringing goods have been sold in brick-and-mortar stores for decades, in its 2020 report to the President, the Department of Homeland Security ("DHS")[3] stated that "e-commerce platforms, third-party marketplaces, and their supporting intermediaries have also served as powerful stimulants for the trafficking of counterfeit and pirated goods."  DEP'T. OF HOMELAND SEC., *Combating Trafficking in Counterfeit and Pirated Goods; Report to the President of the United States* 20 (Jan. 24, 2020), www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

---

attorneys-fees-in-sad-scheme-case-louis-poulsen-v-lightzey.htm ("If you are defending a [Schedule A] case and your case is appealed, please let me know ASAP so we can try to assemble amicus support with adequate lead time.").

[3] SAFE cites to reports from the U.S. Dept. of Commerce, Dept. of Homeland Security, and U.S. Customs and Border Protection.  To the extent necessary, SAFE requests that the Court take judicial notice of these official reports and the information contained therein.  *See Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper"); *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) ("Judicial notice may be taken at any time, including on appeal").

Today, intellectual property owners all face the larger problem caused by the ubiquity of e-commerce platforms: rampant infringement by offshore ecommerce sellers. *See e.g., NBA Props. v. HANWJH*, 46 F.4th 614, 617 (7th Cir. 2022); *Dyson Tech. Ltd. v. David 7 Store*, 132 F.4th 526, 528 (7th Cir. 2025). The most significant obstacles facing intellectual property owners are that offshore ecommerce store owners: (1) operate anonymously, often under fake identities, and often using multiple accounts or profiles, (2) are located outside of the jurisdiction of the U.S., and (3) face no repercussions for trafficking in infringing or counterfeit goods, and therefore have no incentive to stop their illegal activity. Moreover, because the offshore ecommerce sellers operate in counties, such as China, where violations of intellectual property rights are not strictly enforced, there are few mechanisms to hold these counterfeiters liable.

## A. The Global Trade and Significant Harms of Ecommerce Sales of Infringing and Counterfeit Goods

The United States Census Bureau ("USCB") began collecting data on ecommerce sales in 1998, when it became clear online shopping was an "irreversible force." Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. CENSUS BUREAU (Apr. 27, 2022), https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html. That year, the USCB indicated ecommerce sales totaled $5 billion in the U.S. *Id*. In 2024, the total ecommerce sales in the U.S. were $1.1926 trillion, and the

number of ecommerce sales is expected to continue to rise each year. U.S. DEP'T. OF COM., *Quarterly Retail E-Commerce Sales 4ᵗʰ Quarter* 1 CB25-26 (Feb. 19, 2025), https://www2.census.gov/retail/releases/historical/ecomm/24q4.pdf. This trend is ubiquitous worldwide: the International Trade Administration reported that ecommerce sales worldwide have increased 20% *each year* from 2021 to 2024. U.S. DEP'T OF COM., INT'L TRADE ADMIN., *Impact of COVID Pandemic on eCommerce*, https://www.trade.gov/impact-covid-pandemic-ecommerce (last accessed Oct. 8, 2025).

While the sales of legitimate products have increased online, sales of knockoffs, counterfeits, pirated goods, "dupes," and other infringing products also increased in lockstep. The U.S. Customs and Border Protection ("CBP") reported that from 2020 to 2024 the number of goods seized for violating intellectual property rights has doubled. U.S. CUSTOMS & BORDER PROT., PUB. NO. 3964-0125, INTELLECTUAL PROPERTY RIGHTS SEIZURE STATISTICS 7 (2024) https://www.cbp.gov/sites/default/files/2025-01/IntellectualPropertyRightsSeizureStatisticsFiscalYear2024%20FINAL.pdf (last modified Jan. 16, 2025). In 2024, CBP seized over 32 million goods worth the total manufacturer's suggested retail price of $5.42 billion. *Id.*

Reducing the trafficking of infringing and counterfeit goods benefits both rights owners and consumers. Consumers purchasing infringing or counterfeit goods are at risk of potential harm, whether physical or financial. For example, in 2019, local and federal agencies shut down a counterfeit jewelry operation in Los Angeles and

determined that the seized jewelry, valued at about $5 million, contained 200,000 parts per million (ppm) of lead and cadmium, more than twice the acceptable level of 90 ppm per U.S. safety standards. *Counterfeit Goods: A Danger to Public Safety*, U.S. IMMIGR. & CUSTOMS ENF'T, https://www.ice.gov/features/dangers-counterfeit-items (last updated Aug. 19, 2025). In 2022, the American Apparel & Footwear Association published a study which found that over one third of the counterfeit products tested, including footwear, clothing, and other accessories, had "dangerous levels" of toxic chemicals such as lead, arsenic, and cadmium. *Fashion Industry Study Reveals Dangerous Chemicals, Heavy Metals in Counterfeit Products*, AM. APPAREL & FOOTWEAR ASS'N (Mar. 23, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/Fashion_Industry_Study_Reveals_Dangerous_Chemicals_Heavy_Metals_Counterfeits.aspx. In 2023, Michigan State University's Center for Anti-Counterfeiting and Product Protection published a consumer survey study finding that 27% of U.S. consumers lost money from counterfeit purchases, 22% suffered personal injury, and 19% had their personal information compromised. Saleem Alhabash et al., MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT., *Global Anti-Counterfeiting Consumer Survey 2023: A 17 Country Study* 41 (2023), https://a-capp.msu.edu/wp-content/uploads/2024/10/GlobalConsumerSurvey2023_PublicFinal.pdf. That study also reported that 71% of U.S. consumers purchased infringing or counterfeit goods online. *Id.* at 27.

In addition to harming consumers, the business of counterfeit and infringing goods also negatively impacts the economy.  Counterfeit products cost the economy in the form of job losses and loss of tax revenue.

### B.  The Practical Inability to Enforce Intellectual Property Rights Against Offshore Ecommerce Store Operators

The primary obstacle intellectual property owners face in stopping counterfeiters is identifying the fraudulent ecommerce store operators.[4]  The DHS has reported that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling."  DEP'T. OF HOMELAND SEC., *supra* p. 2, at 22; John H. Zacharia & Kari Kammel, *Congress's Proposed E-Commerce Legislation for Regulation of Third-Party Sellers: Why It's Needed and How Congress Should Make It Better*, 21 U.C. DAVIS BUS. L. J. 92, 96 (2020) ("e-commerce platforms often do not collect sufficient information to identify third-party sellers – making it harder (and in some cases impossible) for customers or brand owners to purse third-party counterfeiters or those selling counterfeits online").  Even where information is provided, "counterfeiters routinely

[4] One of the Amici has criticized legislative solutions to curb online infringement in his blog. *See, e.g.*, Eric Goldman, *Why I Oppose the Stop Online Piracy Act (SOPA)/E-PARASITES Act*, TECH. & MKTG. L. BLOG (Nov. 15, 2011), https://blog.ericgoldman.org/archives/2011/11/stop_online_pir.htm; Eric Goldman, *SHOP SAFE Act Reintroduced, Because Some Congressmembers Really Want to Kill Online Marketplaces*, TECH. & MKTG. L. BLOG (Sept. 29, 2023), https://blog.ericgoldman.org/archives/2023/09/shop-safe-act-reintroduced-because-some-congressmembers-really-want-to-kill-online-marketplaces.htm; Eric Goldman, *The SHOP SAFE Act Is a Terrible Bill That Will Eliminate Online Marketplaces*, TECH. & MKTG. L. BLOG (Nov. 15, 2011), https://blog.ericgoldman.org/archives/2021/09/the-shop-safe-act-is-a-terrible-bill-that-will-eliminate-online-marketplaces.htm.

use false or inaccurate names and addresses when registering with these e-commerce platforms." Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157, 186 (2020). In addition, ecommerce operators trafficking in counterfeit goods frequently use multiple profiles to continue selling their infringing goods when one profile is shut down. Dep't. Of Homeland Sec., *supra* p. 2, at 22.

Shutting down the offending storefronts is another separate challenge. Intellectual property owners report significant difficulties attempting to disable any offending ecommerce stores or listings because of bureaucratic or technical hurdles imposed by ecommerce platforms. Chow, *supra*, at 187. For example, some platforms implement notice and takedown procedures that are burdensome, expensive, and time-consuming. *Id*. Even when an ecommerce store is successfully taken down, the same ecommerce store will quickly reappear under a new name. *Id.* at 163; Dep't Of Homeland Security, *supra* p. 2, at 22. Intellectual property owners refer to this cycle as a never-ending game of "Whac-A-Mole." Chow, *supra*, at 187.

Intellectual property owners expend significant time, labor, and capital to deter these fraudulent ecommerce stores from engaging in their illegal activity. *Id*. Inhibiting the deterrence is the fact that most counterfeit ecommerce sellers are located overseas and outside of the jurisdiction of U.S. law enforcement, hindering both criminal

prosecution and payment of civil liabilities imposed.  DEP'T OF HOMELAND SECURITY, *supra* p. 2, at 10-11.

## II.   SCHEDULE A LITIGATION IS AN EFFECTIVE AND MODEL PRACTICE FOR ENFORCING INTELLECTUAL PROPERTY RIGHTS

Individual states "no doubt ha[ve][] an interest in protecting its consumers from purchasing fraudulent merchandise." *NBA Props.*, 46 F.4th at 627 (7th Cir. 2022). However, traditional enforcement tools have not kept pace with the tactics of modern infringers in a rapidly evolving ecommerce landscape.  Kari Kammel & Jessica Boeve, *Beyond the Brick-and-Mortar Paradigm: The Legal and Procedural Foundations of Schedule A Litigation in Combating Online Counterfeiting as Distinct from Traditional Trademark Enforcement*, SSRN,  5-9 (Sept. 19, 2025), https://dx.doi.org/10.2139/ssrn.5508098. Contacting retailers and pulling offending products from a physical self is not a viable solution when everything is digital and the retailer is more like a flea market operator with hundreds and thousands of individual virtual stalls.

Counterfeit enforcement litigation in federal courts is a scalable, flexible, and legitimate approach to protecting intellectual property rights from rampant offshore infringement on ecommerce platforms.  This type of litigation has become known as "Schedule A" litigation, which refers to a type of infringement case where multiple ecommerce sellers of the same product are named in a single case.  Elizabeth Banegas, *Schedule "A" Cases. Not Sad at All*, 65 IDEA: L. REV. FRANKLIN PIERCE CTR. FOR INTELL. PROP. 107, 108-109 (2024).  Schedule A cases are so named because of how the complaint

is filed: the complaint is filed on the docket and "Schedule A" to the complaint is filed

temporarily under seal to prevent the ecommerce store operators from learning of the

proceedings and dissipating assets overseas. *See, e.g., id.* at 122-23 (citing *Chrome Cherry*

*Ltd. v. P'ships & Unincorporated Ass'ns Identified on Sched. "A,"* No. 21-cv-05491, 2021 WL

6752296, at *2 (N.D. Ill. Oct. 20, 2021) (granting plaintiff's motion to file under seal since

plaintiff argued that defendants would likely destroy relevant evidence, "register new

e-commerce stores under new seller aliases and move assets to offshore bank accounts

outside the jurisdiction of the U.S.")).

A key reason for the success of Schedule A litigation is the ability to provide

legitimate deterrence in the form of a damages payment. *See* Kammel & Boeve, *supra* p.

8, at 20-21; *see also Louis Vuitton S.A.*, 875 at 584 ("for the smaller the violator, the less

likely he is to be caught, and the more needful therefore is a heavy punishment if he is

caught."). Schedule A cases also promote judicial efficiency and are legally sound. As

discussed in more detail below, because Schedule A cases have been filed for over a

decade, numerous appellate courts have had the opportunity to review and uphold

various procedural aspects of Schedule A litigation.

### A. Schedule A Litigation Deters Future Intellectual Property Violations

Schedule A litigation is effective because it provides a deterrence mechanism

through *ex parte* temporary restraining orders ("TROs") that restrain transfer of funds

out of the sellers' accounts and outside the court's jurisdiction. Specifically, the asset

restraints ensure that infringers are required to turn over ill-gotten profits. Because of this deterrence mechanism, nearly all intellectual property owners that have filed Schedule A cases observe a significant reduction in infringing listings after filing a series of cases, and, for some, online infringements are essentially eliminated.

There is a high risk that offshore ecommerce operators, upon learning they are named defendants in a case, will fraudulently transfer assets outside this jurisdiction if an asset restraint is not in place. *See Deckers Outdoor Corp. v. P'ships & Unincorporated Ass'ns Identified on Sched. A*, 2013 U.S. Dist. LEXIS 205985, at *7 (N.D. Ill. Oct. 30, 2013) ("Schedule A, which is filed under seal in order to allow [plaintiff] time to serve financial institutions and payment hosting services with the TRO without advance warning to the defendants, who likely would seek to transfer the money elsewhere."). If the defendants were to learn of the proceedings prematurely, they can hide or transfer assets to foreign jurisdictions, preventing a plaintiff from realizing any relief from the infringement and interfering with the district court's ability to grant relief.

The effectiveness of Schedule A litigation has been demonstrated by empirical studies. In *Toyota Motor Sales, U.S.A., Inc. v. P'ships & Unincorporated Ass'ns Identified on Sched. "A,"* counsel for a Schedule A plaintiff provided case studies through an affidavit by counsel for several former and current clients. No. 1:24-cv-04331 (N.D. Ill. Aug. 9, 2024), ECF No. 54. One case study, for "a well-known entertainment brand," reproduced below as Figure 1, showed an 88% decrease in ecommerce stores selling

infringing merchandise from 2021 to 2023, from 4,589 infringing ecommerce stores in

2021 to just 570 in 2023. *Id*.



*Figure 1*

Two other case studies indicate that Schedule A litigation is so effective that for

some intellectual property owners only a handful of Schedule A cases need to be filed to

achieve the necessary deterrent effect. *Id*. For example, as shown in Figure 2 below, a

case study for "a small fitness supplement manufacturer" showed an 85% decrease in

the number of infringing marketplaces from 2021 to 2023 with only four Schedule A

cases filed. *Id*. No cases were filed for this plaintiff in 2024 or 2025 because no

infringing marketplaces had been identified. *See id*.



*Figure 2*

Securing an asset restraint allows Schedule A plaintiffs to seek relief necessary to deter future illegal infringing activity. *See 4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 213 (2d Cir. 2019) ("[D]isgorgement of profits is 'the only way the courts can fashion a strong enough deterrent.'") (quoting *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970)); *see also Estate of Bishop v. Equinox Int'l Corp.*, 256 F.3d 1050 (10th Cir. 2001) ("[W]e have recognized that 'several of our sister circuits have recognized that an award of profits may be proper, absent a showing of actual damage, as a deterrent to willful infringement' . . . we would similarly accept this rationale for awarding profits in a trademark infringement case.") (internal citation omitted).

The law professor *Amici* claim that "the combination of *ex parte* TROs and platform freezes creates asymmetric settlement pressure that deters defense participation . . . ." [DE 25 pg 10]. This argument assumes the defendants in Schedule A

- 12 -

cases are not selling counterfeit products and have a defense, but the opposite is true.

Like the defendants in *NBA Props. v. HANWJH*, Schedule A defendants are sued

because they are selling products that purport to be genuine products and would dupe

unsuspecting consumers. 46 F.4th at 617. Like any other intellectual property lawsuit,

the infringer would certainly want to settle for a much smaller sum than they would

have had to pay if the case was fully adjudicated. *See, e.g., Luxottica USA LLC v. P'ships*

*& Unincorporated Ass'ns Identified on Schedule "A,"* 2015 U.S. Dist. LEXIS 78961, at *1

(N.D. Ill. June 18, 2015) (awarding $150,000 in statutory damages on plaintiff's motion

for summary judgment); *see River Light V, L.P. v. Zhangyali*, 2016 U.S. Dist. LEXIS 111301,

at *13 (N.D. Ill. Aug. 22, 2016) (awarding $100,000 in statutory damages on plaintiff's

motion for summary judgment); *see Entm't One UK Ltd. v. 2012shiliang*, 384 F. Supp. 3d

941, 946, 954 (N.D. Ill. 2019) (awarding $100,000 in statutory damages on plaintiff's

motion for summary judgment); *see also Volkswagen AG v. iman365-usa*, 2020 U.S. Dist.

LEXIS 34218, at *25 (N.D. Ill. Feb. 28, 2020) (awarding $75,000 in statutory damages on

plaintiff's motion for summary judgment). The "pressure" deterring defense is guilt,

and an unwillingness to appear in American courts.

The law professor *Amici* do not dispute that the Schedule A counterfeiters are

selling infringing products and attempting to evade being located. Rather, the law

professor *Amici* argue that it is unfair to sue the counterfeiters in groups or to use *ex*

*parte* TROs to ensure that the defendants do not make off with their ill-gotten gains.

Neither of those criticisms are appropriate because the vast majority of Section A cases identify counterfeiters and infringing sales.

**B. Appellate Courts Have Upheld Procedural Aspects of Schedule A Litigation**

The law professor Amicus Brief repeatedly claims that "Schedule A cases are rarely appealed" [DE 25 pgs, 3, 8, 15] and that this appeal is a "rare opportunity for this Court . . . to address the abuses of the Schedule A litigation." [*Id.* at 3]. This assertion is objectively incorrect.

Multiple Schedule A cases have been appealed with adversarial presentation. Recently, this Court reviewed an appeal of a Schedule A case where a defendant sought reversal of the district court's order denying its motion for attorney fees. *Jergenson v. Inhale Int'l Ltd.*, 2024 U.S. App. LEXIS 25278, at *1-*2 (7th Cir. Oct. 7, 2024) (affirming the district court's decision to deny the motion for attorney fees). Other Schedule A case appeals include Seventh Circuit and Second Circuit cases affirming findings of personal jurisdiction, a Fifth Circuit case affirming that there was "no basis to find misjoinder" and upholding alternative service under Fed. R. Civ. P. 4(f)(3), and this Circuit's finding that a district court abused its discretion by refusing to award infringer's profits in a trademark case. *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 627 (7th Cir. 2022); *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 280 (2d Cir. 2024); *Viahart, L.L.C. v. GangPeng*, 2022 WL 445161, at *4 (5th Cir. Feb. 14, 2022); *Dyson Tech. Ltd. v. David 7 Store*, 132 F.4th 526, 529 (7th Cir. 2025). The Federal Circuit has also addressed evaluating design patent claims

in the context of a Schedule A case. *See ABC Corp. I v. P'ship & Unincorporated Ass'ns. Identified on Sched. "A,"* 52 F.4th 934, 937 (Fed. Cir. 2022); *ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Sched. "A,"* 2025 U.S. App. LEXIS 20651, at *2 (Fed. Cir. 2025).

Various aspects of Schedule A cases have also been upheld by Circuit courts in other contexts. For example, Circuit courts have also found that it is proper to proceed against "John Doe" defendants and that pleading against defendants engaged in the same conduct collectively is proper. *See, e.g., World Wrestling Ent., Inc. v. Unidentified Parties*, 770 F.3d 1143, 1144-46 (5th Cir. 2014); *Gillespie v. Civiletti*, 629 F.2d 637, 642-43 (9th Cir. 1980); *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009). Thus, naming multiple entities that are all engaging in the same illicit activity in the same manner and same location is appropriate.

Circuit courts have also affirmed *ex parte* TROs with asset restraints against offshore counterfeiters likely to dissipate assets. *See, e.g., Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132-33 (2d Cir. 2014); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d at 561 (9th Cir. 1992).[5] As the Second Circuit explained, proceeding with an *ex parte* TRO is

---

[5] The *Gucci Am.* Court also rejected the argument that the asset restraint "exceeded the court's equitable authority because it failed to identify the 'particular property' derived from the defendants' allegedly unlawful activities that the plaintiffs seek to recover" and that the plaintiffs' request for an accounting was illusory. *Gucci*, 768 F.3d at 133; *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (affirming and finding asset freeze proper for the

appropriate, particularly in counterfeiting cases, when providing notice would "render fruitless further prosecution of the action." *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979); *see also Am. Can Co. v. Mansukhani*, 742 F.2d 314, 325 (7th Cir. 1984) ("The requirements of Rule 65(b) need not be burdensome when there is truly a need to proceed *ex parte*.").

A plaintiff can also try demonstrate to a court that experience with similarly situated defendants warrants proceeding *ex parte*. *See, e.g., Matter of Vuitton et Fils S.A.*, 606 F.2d at 2, 5; *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 651 (6th Cir. 1993); *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). Additionally, the Fifth, Ninth, and Federal Circuits have upheld alternative service of process under Fed. R. Civ. P. 4(f)(3), which is typically used to serve China-based ecommerce store defendants. *See, e.g., Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494 (5th Cir. 2018); *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002); *Viahart, L.L.C. v. GangPeng*, 2022 WL 445161 (5th Cir. Feb. 14, 2022); *In re OnePlus Technology (Shenzhen) Co.*, 2021 WL 4130643, at *3 (Fed. Cir. Sept. 10, 2021).

### C. Schedule A Cases Are Efficient and Reduce the Burden on the Courts

In addition to being effective, Schedule A cases are also efficient. Schedule A cases promote judicial economy because they, by their very nature, target defendants

---

pendency of a case where plaintiff seeks an accounting of profits and in the alternative, statutory damages).

who are engaged in the same illicit activity in the same manner and same location and collectively cause the same type of harm to plaintiffs.  *See* Kammel & Boeve, *supra* p. 8, at 14-16.  By joining a set of defendants in a single action, Schedule A plaintiffs reduce the number of cases filed on court dockets.  *Id.* at 18; *see* Banegas, *supra* p. 8, at 153-54. Multiple defendants all counterfeiting or infringing the same or similar products are not prejudiced if they are joined together in one action.  *See Neman Bros. & Assocs. v. P'ships & Unincorporated Ass'ns Identified in Schedule A*, 2024 U.S. Dist. LEXIS 223383, at *10-*11 (N.D. Ill. Dec. 10, 2024; *see also, Merch Traffic, LLC v P'ships & Unincorporated Ass'ns Identified on Sched. "A"*, No. 25-cv-01180 (N.D. Ill. Apr. 17, 2025), ECF No. 36 ("[J]oinder poses no risk of prejudice or unfairness to the various Defendants, who will each have an opportunity to defend against Plaintiff's claims in the same way they would if the cases were filed separately").[6]

## CONCLUSION

SAFE submits that the foregoing supports affirmance of the district court's underlying decision.

---

[6] To assist both the courts and practitioners in promoting efficient and effective litigation, SAFE publishes a guide of "Best Practices".  *Best Practices*, SAFE BAR ASS'N, https://safeip.org/best-practices/ (last visited Oct. 16, 2025).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE- STYLE REQUIREMENTS

The undersigned certifies on **October 21, 2025**, that

1. This document complies with the type-volume limit of Seventh Circuit Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 4492 words.

2. This document complies with Fed. R. App. P. 27(d)(1)(E) because it complies with the typeface and the type-style requirements of Seventh Circuit Rule 32(b) because:  this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 12-point Palatino Linotype Font, with footnotes in 11-point.

By: /s/ Christopher Carmichael
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

The undersigned certifies that on **October 21, 2025**, an electronic copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

By: /s/ Christopher Carmichael